HORTMAN, Plaintiff-Appellant: AETNA CASUALTY & SURETY COMPANY, Plaintiff, V. BECKER CONSTRUCTION COMPANY, INC., and others, Defendants: MARK F. PFALLER ASSOCIATES, INC., and another, Defendants-Respondents.†

Supreme Court

*No. 77–132. Argued October 8, 1979.—*
*Decided November 6, 1979.*
(Also reported in 284 N.W.2d 621.)

---

† Motion for reconsideration denied, with costs, on December 21, 1979.

For the appellant there were briefs by *Albert J. Goldberg* and *Goldberg, Previant & Uelmen, S.C.*, of Milwaukee, and oral argument by *Albert J. Goldberg*.

For the respondents there was a brief by *Jack R. Wiedabach, Douglas H. Starck* and *Prosser, Wiedabach & Quale, S.C.*, of Milwaukee, and oral argument by *Jack R. Wiedabach*.

CONNOR T. HANSEN, J. Mark F. Pfaller Associates, Inc., and John J. Flad & Associates, Inc. (hereinafter respondents), were retained as an architectural consortium by St. Michael's Hospital in Milwaukee in regard to an addition to the hospital.

Becker Construction Company, Inc., was the general contractor, and Leon Hortman was an employee of Becker. Hortman was injured, and at the time of the injury, he was working outside the building at ground level and

was hit by a piece of lumber which apparently blew off the top of the building under construction.

Hortman and Aetna Casualty & Surety Company commenced this action to recover damages for the injuries Hortman sustained. Becker Construction Company, Inc., was made a party by virtue of sec. 803.03 (2) (a), Stats. The architects and certain subcontractors were also parties.

This appeal concerns only the summary judgment that dismissed the complaint of Hortman alleging a cause of action against the architects. The issues presented on appeal relate to the liability of an architect under sec. 101.-11, Stats., to an employee of a general contractor when the architect has been retained, by contract, to perform services for the owner of the property.

Donald S. Bishop and Paul Shmelzer were employed by the architects to perform architectural and inspection services at the construction site. Bishop was the architects' full-time project representative and Shmelzer was at the site occasionally. Bishop was at the building at the time Hortman was injured. The affidavits filed in the summary judgment proceeding refer to Exhibit A and Exhibit B. Exhibit A is the owner-architect agreement. Exhibit B is attached to Exhibit A and sets forth the duties, responsibilities and limitations of authority of the architect's full-time project representative.

In support of their motion for summary judgment, respondents submitted the affidavit of Donald S. Bishop, an employee of Mark F. Pfaller Associates, Inc.; the affidavit and supplementary affidavit of Douglas H. Starck, one of the lawyers for respondents; and the affidavit of Mark F. Pfaller, president of Mark F. Pfaller Associates, Inc., which incorporated by reference the owner-architect agreement identified as Exhibit A, and the list of duties, responsibilities and limitations of authority of the arch-

itect's full-time project representative, as contained in Exhibit B, and a statement that it was Becker's responsibility to see to it that materials on the job site were cleaned up. Pertinent portions of the owner-architect agreement are also set forth in respondents' answer.

Paragraphs 1.1.15, 1.1.18 and 1.1.22 of the owner-architect agreement state:

"1.1.15 The Architect shall make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an architect, he shall endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor. The Architect, through its Full-time Project Representative, shall have the further responsibility provided in Paragraph 1.2.4. *The Architect shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, and he shall not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents.*" (Emphasis supplied.)

"1.1.18 The Architect shall have authority to reject such Work which does not conform to the Contract Documents, and will inform the Owner of said action. The Architect subject first to the Owner's prior approval shall also have authority to require the Contractor to stop the Work whenever in his reasonable opinion it may be necessary for the proper performance of the Contract. The Architect shall not be liable to the Owner for the consequences of any decision made by him in good faith either to exercise or not to exercise his authority to stop the Work."

"1.1.22 The Architect shall not be responsible for the acts or omissions of the Contractor, or any Subcontractors, or any of the Contractor's or Subcontractor's agents or employees, or any other persons performing any of the Work."

Pursuant to the owner-architect agreement, respondent were required to provide a full-time project representative at the construction site.

Paragraph 1.2.4 of the agreement states:

"Through the on-site observations by the Full-time Project Representative of the Work in progress, the Architect shall provide further protection for the Owner against defects in the Work. The furnishing of such project representation shall not, however, make the Architect responsible for the Contractor's failure to perform and/or correct the Work in accordance with the Contract Documents. Nothing herein shall prevent the Owner from hiring his own qualified Project Representative, in addition to the Architect's Full-time Project Representative."

The duties, responsibilities and limitations of authority of the full-time project representative are set forth in Exhibit B of the owner-architect agreement. The following provisions appear in Exhibit B:

"2. OBSERVATIONS: Conduct on-site observations and checking of the Work in progress as a basis for determining conformance of Work, materials and equipment with the Contract Documents. Report any defective Work to the Architect."

"17. STOPPING THE WORK: If a situation arises during construction which in your view requires that the Work be stopped, report such situation immediately to the Architect and Owner.

"18. LIMITATIONS OF AUTHORITY: Unless specific exceptions are established by written instructions issued by the Architect:

". . . .

"c) Do not enter into the area of responsibility of the Contractor's superintendent.

". . . .

"e) Do not advise on, or issue directions relative to, any aspect of construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work.

" . . . .

"h) Do not stop or reject the Work except on explicit instructions from the Architect."

In opposition to the motion for summary judgment appellant submitted the affidavit and supplementary affidavit of Albert J. Goldberg, one of the lawyers for appellant. Both of these affidavits and the affidavits of lawyer Starck consist of excerpts from a deposition of Donald S. Bishop.

The following facts appear in the affidavit of Donald S. Bishop and the affidavits of the lawyers.

On June 8, 1973, Mr. Bishop was employed by respondents as the architects' full-time project representative for the erection of the addition to St. Michael's Hospital. His duties and reponsibilities were those set forth in Exhibit B attached to the owner-architect agreement. His duties were to see to it that the construction was completed according to plans and specifications, both with respect to the quality of the material and the quality of the workmanship.

Bishop chaired and attended conferences held at the construction site. Questions about safety and housekeeping came up at the meetings on rare occasions. Questions about unsafe conditions were brought up by anyone who wanted to. If there was a complaint about unsafe conditions, the contractor would have been responsible for the problem and was advised to clean it up or correct it. The presence of a length of wood would not be a subject for conference, but would be taken up with the general contractor. Bishop did, however, state that it "could be" a subject for conference.

Bishop moved in every construction area, and in so doing, was performing the duties set forth in Exhibit B.

The whole construction site was his work site. He went up to observe work on the penthouse on the roof to check the quality of the materials and to see that the workmen were doing a good job of anchoring and locating materials. He was to see to it that there was no damage to the panels when they were installed. If he observed damage to any member that was going to be installed, his duty was to see that it was repaired or replaced by a good panel. It was his duty to go to the roof as one of the work areas, so long as any work was being done. It was his duty to conduct an examination of the completed penthouse to determine whether the panels and the steel construction in general were according to the specifications. After the penthouse was completed there was still considerable work to be done on the roof. The general contractor had to do this work and the architect told him what had to be done.

Bishop was familiar with the excavation where the accident occurred, because he visited it every day. Sometimes he was suspicious of the quality of the earth that they were building on, so he would go down and check it for what he thought was the ability to stand a load. He checked the quality of the work which was put in to carry out the structural engineer's plans. At the time of the accident, Hortman and his co-workers were spreading gravel, Bishop had been in the area to observe the spreading and then went about the areas where other work was being done on the day in question. He was not aware of the incident involving the plaintiff until one hour after its occurrence.

Bishop was not aware at any time prior to the accident of any pieces of wood such as the piece which allegedly struck the plaintiff. He also stated he had seen 4 x 4's at various times, but "we" wouldn't let them lie there too long because they might damage the roof, and the weight of the material on the roof would cause the gravel to pene-

trate the roof. He would ask to have this corrected. But he could not recall when he had asked to have such lengths of wood removed.

Earl Borchardt, superintendent of the job, was at the construction site at all times on behalf of the general contractor. It was the general contractor's responsibility to see to it that materials on the job site were cleaned up. Borchardt was responsible for all of the work that the general contractor was doing, and also for the subcontractors to see that their work was done properly. It was to him that Bishop went for any work that was the responsibility of Becker Construction Company.

Starck's affidavit also contains excerpts from Earl Borchardt's deposition. Borchardt stated that when he was on the roof, if he saw pieces of wood lying around loose, he would not arrange to have them removed from the roof. But if the piece of wood would have been picked up, it would have been his job as construction superintendant to see that it did get picked up. When a contractor or subcontractor is finished using a 4 x 4, the piece of wood is usually removed by subcontractors who clean up at the end of a job. If this is not done, then the general contractor cleans up, or sometimes it is prorated among the subcontractors.

On the basis of the foregoing summary of the undisputed facts as set forth in the pleadings and affidavits, the trial court granted the respondents' motion for summary judgment and judgment was accordingly entered.

This court set forth the standard to be applied in determining whether summary judgment is appropriate in *Taterka v. Ford Motor Co.*, 86 Wis.2d 140, 144, 271 N.W. 2d 653 (1978) :

"We have held that summary judgment may be granted where there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law.

Sec. 802.08(2), Stats. The trial court is to determine from the pleadings and affidavits whether a cause of action is alleged and whether any material issues of fact are presented. *Krezinski v. Hay,* 77 Wis.2d 569, 572, 573, 253 N.W.2d 522 (1977). Summary judgment may be granted where there is no factual dispute or where no competing inferences arise from undisputed facts and the law resolving the issues is clear. *Lecus v. American Mut. Ins. Co. of Boston,* 81 Wis.2d 183, 189, 260 N.W.2d 241 (1977); *Matthew v. American Family Mut. Ins. Co.,* 54 Wis.2d 336, 339, 195 N.W.2d 611 (1972)."

In view of the language of sec. 802.08(2), Stats., which provides that summary judgment

". . . shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[,]"

this court no longer can accord the trial court wide latitude in deciding to grant or deny summary judgment. *Wright v. Hasley,* 86 Wis.2d 572, 578, 273 N.W.2d 319 (1979).

It is our opinion that the issues presented on appeal can be stated as follows:

1. Were respondents "employers" within the meaning of sec. 101.01(2)(c), Stats.?

2. May a court consider the terms of a contract between the owner and the architect in order to determine whether a duty is owed by the architect to an employee of the general contractor under the safe place statute?

3. Did respondents owe a duty to appellant to maintain a safe place of employment under sec. 101.11(1), Stats.?

In his complaint, appellant alleged that respondents were employers within the meaning of sec. 101.01(2)(c), Stats., and were owners of a place of employment within

the meaning of sec. 101.01 (2) (i). The trial court, however, granted respondents' motion on the ground that respondents were not owners of a place of employment or a public building. The trial court stated:

"Although a hospital is considered under the statute as a public building, *Watry v. Carmelite Sisters* (1957) 274 Wis. 415, it does not apply ' ". . . to temporary conditions having no relation to the structure of the building or the materials of which it is composed." ' *Voeltzke v. Kenosha Memorial Hospital* (1969) 45 Wis.2d 271, 279, 172 N.W.2d 673. More important the evidence establishes that the joint venture neither owns the building nor the piece of wood involved.

"The venture did have employees on the job site (Bishop and one Paul Schmelzer [sic]) and Bishop was there on the day of the accident and would thus be considered as an owner of a place of employment if sufficient control is exercised by it. . . ."

The trial court did not specifically decide whether respondents were "employers."

Sec. 101.01 (2) (c), Stats., defines "employer" as

". . . every person, firm, corporation, state, county, town, city, village, school district, sewer district, drainage district and other public or quasi-public corporations as well as any agent, manager, representative or other person having control or custody of any employment, place of employment or of an employe."

It is clear that respondents had control or custody of both "employment" and "employes." "Employment" is defined in sec. 101.01 (2) (b), Stats., as

". . . any trade, occupation or process of manufacture, or any method of carrying on such trade, occupation or process of manufacture in which any person may be engaged, except in such private domestic service as does not involve the use of mechanical power and in farm labor as used in par. (a)."

Sec. 101.01 (2) (d), Stats., defines "employe" as

". . . every person who may be required or directed by any employer, in consideration of direct or indirect gain or profit, to engage in any employment or to go or work or be at any time in any place of employment."

Both Donald S. Bishop and Paul Shmelzer were employed and directed by respondents, in consideration of direct or indirect gain, to perform architectural or inspection services at the construction site of the addition to St. Michael's Hospital, and were, therefore, "employes" within the meaning of sec. 101.01 (2) (d). The inspection services which these two employes performed were "employment" within the meaning of sec. 101.01 (2) (b). Both the employees and the services they performed were under the control and custody of respondents. Thus, respondents were "employers" within the meaning of sec. 101.01 (2) (c).

The next issue is whether, under the facts of this case, the contractual terms between the owner and the architect can be considered in determining whether the architect owed a duty to an employee of the general contractor under the safe place statute.

Respondents entered into a contract with the owner which limited the duty and responsibility of respondents at the construction site. Appellant contends that the contract cannot determine the duties that respondents owed to their own employees at the premises which were a place of employment for those employees. While this general statement may be true, the duty which is relevant in this case is the duty the architects owed to the appellant.

This court has never expressly stated that a contract between an owner and an architect may be used to determine whether a duty under the safe place statute is owed by an architect to persons on the premises. In

several cases, however, this court has looked to the terms of a contract in determining whether a party has sufficient control or custody of the premises in question so as to establish a duty under the safe place statute.

In *Luterbach v. Mochon, S., H., J., Inc.,* 84 Wis.2d 1, 267 N.W.2d 13 (1978), an employee of a contractor was injured on a construction site when a cave-in occurred while he was working in an excavation. The plaintiffs brought an action against the architect and alleged that the defendant was negligent in failing to properly supervise and inspect the construction site. The plaintiffs presented three theories of liability: (1) violation of contract, (2) common-law negligence, and (3) violation of the safe place statute. This court affirmed the trial court's grant of defendant's motion for summary judgment.

The defendant had entered into an agreement with a school district to perform architectural services in connection with the erection of an addition to a high school. The contractor had also entered into an agreement with the school district. The court took into consideration both of these contracts and stated:

"It must be noted that we are dealing with two contracts: the owner-architect agreement and the owner-contractor agreement. The basis for the Luterbachs' case lies in language found in the owner-contractor agreement. Although the architect would not normally be bound by a contract to which it is not a party, the Luterbachs point out that the owner-architect contract provided that the architect would prepare certain provisions of the owner-contractor agreement and would generally assist the owner in drafting the contract forms. Furthermore, the owner-architect agreement makes reference to the owner-contractor agreement in defining certain of the architect's duties. Thus, under these circumstances, *we should consider the owner-contractor agreement together with the owner-architect agreement in determining the architect's duties.*" (Emphasis supplied.) *Id.* at 4.

In regard to the safe place theory of liability, the plaintiffs in that case contended that the architect was an owner within the meaning of sec. 101.01(2)(i), Stats., and that the architect owed a duty to maintain the job site in a safe condition. In determining whether the architect had sufficient control or supervision to be considered an "owner," this court relied on the provisions of the owner-architect agreement:

"The status of the architect as an owner is clearly refuted under the above standards by reference to the contract provisions. The general supervisory powers noted in the owner-contractor agreement cannot camouflage the limited nature of the architect's supervisory duties as set forth in the owner-architect contract. . . ." *Id.* at 10.

*Berger v. Metropolitan Sewerage Comm.*, 56 Wis.2d 741, 203 N.W.2d 87 (1973) was an action for the wrongful death of two men employed by a construction contractor building a sewer under contract with the sewerage commission. The plaintiffs alleged that the sewerage commission was the owner of the sewer where the accident occurred and was thereby the owner of a place of employment. The sewerage commission moved for summary judgment and supported its motion with an affidavit which essentially stated that the commission entered into a contract with the construction corporation, and in this agreement the corporation agreed to provide all labor, materials, tools, expendable equipment and all utility and transportation services required to construct the sewer in accordance with the plans and specifications set forth in the contract. This court affirmed the trial court's grant of the summary judgment motion, and, in determining whether the sewerage commission was the owner of a place of employment within the contemplation of the safe place statute, this court took into consideration the construction contract:

"Although the sewerage commission retained great inspection authority over all facets of the sewer's actual construction, under the contract the contractor agreed to perform all tests necessary to the completion of the sewer, to furnish all of the needed labor, materials, necessary tools and equipment, and to provide all utility and transportation services necessary to complete the sewer." *Id.* at 747.

In *Potter v. Kenosha*, 268 Wis. 361, 68 N.W.2d 4 (1955), the city, as owner, had entered into a contract with a sewer contractor for the installation of a sanitary sewer. An employee of the contractor died when the bank of a trench, the walls of which had not been shored, caved in. The plaintiff contended that the construction site was a place of employment owned by the city and the city had a legal duty to construct and maintain the place so as to render it safe. In affirming the trial court's judgment of nonsuit, this court quoted at length from several provisions in the construction contract. The court held that the city had no control over the place of employment since by its contract it merely designated the place where the sewer was to be located and fixed the standard of quality and quantity of construction that it desired. Also, the contractor had agreed under the contract to provide necessary shoring and had bound himself to comply with all laws, regulations and ordinances, including the industrial commission's order on trenches.

This court also made reference to the contract in *Mickelson v. Cities Service Oil Co.*, 250 Wis. 1, 6, 26 N.W.2d 264 (1947), stating that under the series of contracts made by the defendant company, the subcontractors were not required to exercise any precautions, but the premises were wholly under the control of the defendant.

*See also: Mixis v. Wisconsin Public Service Co.*, 26 Wis.2d 488, 132 N.W.2d 769 (1965).

These cases stand for the proposition that it is appropriate to consider the provisions of the owner-architect agreement in the instant case in order to determine whether respondents owed a duty to appellant under the safe place statute.

If the respondents had a duty under the safe place statute to make the building site reasonably safe for frequenters, then that duty is nondelegable. *Barrons v. J. H. Findorff & Sons, Inc.,* 89 Wis.2d 444, 458, 278 N.W.2d 827 (1979); *Mickelson v. Cities Service Oil Co., supra,* at 6; *Tiemann v. May,* 235 Wis. 100, 106, 292 N.W. 612 (1940); *American Mut. Liability Ins. Co. v. Chain Belt Co.,* 224 Wis. 155, 162, 271 N.W. 828 (1937), and the existence or the scope of that duty can be established by reference to contract terms. *Mickelson v. Cities Service Oil Co., supra,* at 6.

The final question to be resolved is whether the respondent architects had a duty under the safe place statute to the general contractor's employee to make the place reasonably safe.

Sec. 101.11 (1), Stats., provides:

". . . Every employer shall furnish employment which shall be safe for the employes therein and shall furnish a place of employment which shall be safe for employes therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employes and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe."

An employee of an independent contractor doing work on the premises is a frequenter working in a place of employment. *Sampson v. Laskin,* 66 Wis.2d 318, 326, 224 N.W.2d 594 (1975) ; *Young v. Anaconda American Brass Co.,* 43 Wis.2d 36, 45, 168 N.W.2d 112 (1969) ; *Mustas v. Inland Construction, Inc.,* 19 Wis.2d 194, 200, 120 N.W.2d 95, 121 N.W.2d 274 (1963) ; *McNally v. Goodenough,* 5 Wis.2d 293, 300, 92 N.W.2d 890 (1958) ; *Frankovis v. Klug & Smith Co.,* 275 Wis. 156, 161, 81 N.W.2d 495 (1957). Thus, the appellant, as an employee of the general contractor, was a frequenter as defined by the safe place statute, and also the respondent architects were employers as defined by the statute. However, in resolving the legal issue as to whether the architect is liable to a frequenter one must look to the contract between the owner and the architect. A person owes a duty under the safe place statute only if he has the right of supervision and control. *Lemacher v. Circle Const. Co., Inc.,* 72 Wis.2d 245, 249, 240 N.W.2d 179 (1976) ; *Barth v. Downey Co., Inc.,* 71 Wis.2d 775, 779, 239 N.W.2d 92 (1976). More specifically, respondents were one of several contractors which were on the premises, and thus, what this court said in *Waskow v. Robert L. Reisinger Co.,* 180 Wis. 537, 543, 193 N.W. 357 (1923), is applicable:

". . . As between the several contractors it was undoubtedly the duty of each to so conduct the work *under its control* as to furnish safe places of employment and to adopt methods reasonably adequate to render the employment and places of employment safe not only for his employees but also for frequenters. . . ." (Emphasis supplied.)

This court has stated several times the type of control over the premises which is necessary before a person can be held liable under the safe place statute. Some of

these cases involve the question of whether a person could be held liable as an "owner"; others involve the question of whether the owner and general contractor could be held liable.

The requirement that a person have control is the same for employers as for owners. Sec. 101.01 (2) (c), Stats., defines "employer" as a "person having *control or custody* of any employment, place of employment or of any employe," (Emphasis supplied.) while "owner" is defined in sec. 101.01 (2) (i) as a "person having ownership, *control or custody* of any place of employment or public building." (Emphasis supplied.)

In *Potter v. Kenosha, supra,* at 372, this court held:

"We are constrained to hold that when an owner turns over to an independent contractor the complete control and custody of a safe place, whereon or whereunder the contractor creates a place of employment for the purpose of fulfilling the terms of the contract, the owner reserving no right of supervision or control of the work excepting that of inspection or to change the plan with reference to the construction to be furnished, if thereafter in the performance of the work under the contract the premises are changed by the contractor and as a result a hazardous condition is created, the owner does not become liable to the contractor's employee injured as a consequence of such hazardous condition while acting in the scope of his employment. . . ."

The contract between the city and contractor provided that the city engineer could suspend work if it was required in his opinion, and provided that the city appoint an inspector to inspect all work and materials and to prevent any deviation from the specifications. The court stated:

"It is clear that the purpose of the city's reservation in the contract of the right to suspend work pertained only to its privilege to inspect the progress of the work and to determine whether it desired change of that which

was to be furnished under the contract. The arrangement did not impair the owner-independent-contractor relationship existing between the parties. Korzilius, the city inspector, was not authorized to direct the means employed by the contractor in furnishing the sewer. His function was to examine the work and material as the job progressed in order to make certain that the city would obtain the kind of sewer structure which it had ordered. The contractor would not have been bound, by any suggestion or direction made by Korzilius or any other of the city employees, to erect shoring as required by the commission's order." *Potter v. Kenosha, supra,* at 376.

In *Berger v. Metropolitan Sewerage Comm., supra,* the facts showed that the sewerage commission regularly maintained an office at the construction site staffed by several full-time employees, including engineers. The duties of these engineers included setting, in accordance with the contract specifications, the accurate line and grade measurements, inspecting and analyzing the concrete and making daily progress reports. Although the commission retained inspection authority over all facets of the sewer's actual construction, the contractor agreed under the contract to perform all tests necessary to the completion of the sewer, to furnish all of the needed labor, materials, necessary tools and equipment, and to provide all utility and transportation services necessary to complete the sewer. The court held:

"The instant case presents an inspection situation close to the one presented in *Weber.* [*Weber v. Hurley,* 13 Wis.2d 560, 109 N.W.2d 65 (1961).] In *Weber* this court felt there existed a distinction, for purposes of determining who was in control of the construction, between certain restrictions or specifications relating to the end result and the actual manner in which the work was accomplished. In the instant case there were pages of specifications to be followed by the independent contractor. The sewerage commission was present on the

jobsite to insure that the sewer was built according to those specifications. The sewerage commission did not exercise control over the actual manner in which the specifications were complied with. To hold, as appellants urge, that the sewerage commission is exercising actual control over the construction of a sewer when it employs engineers to insure compliance with their detailed and complex specifications, is tantamount to holding the mere detailed specifications themselves indicate that degree of control referred to in *Potter*. The presence or absence of engineering inspectors, despite their authority to stop construction progress for lack of compliance with the specifications, is not a manifestation of control. These employees merely enforce the contract." *Berger v. Metropolitan Sewerage Comm., supra*, at 749, 750.

*Barth v. Downey Co., Inc., supra*, was an action brought against a general contractor by an employee of a subcontractor which was engaged in dismantling and removing ducts from the fan room of a city building under a remodeling contract between the city and the general contractor. The plaintiff fell to the floor and was injured when part of the supported portion of the duct on which he was kneeling while cutting off the ducts from within the duct, came off. The action was brought against the defendant as an owner *and employer* under the safe place statute. This court held that the general contractor had not reserved a right of supervision or control, and, therefore, owed no duty to the plaintiff under the safe place statute. The court stated:

". . . There is no duty on the part of a general contractor to superintend the activities of the employee of a subcontractor. Ordinarily, as in the case of an owner hiring an independent contractor to do work on his building, the general contractor reserves no right or control of the work excepting that of inspection or of changing the plan with reference to the construction to be furnished. That alone is not enough to make such owner or such general contractor liable for a frequenter's

injury while such frequenter was acting in the scope of his employment for someone other than such owner or general contractor. Appellant's claim that directions given to the subcontractor's work crew as to where to start and how much of the ducts to leave attached to the wall constituted a retention of control is without merit. The test our court has stated is whether the owner, or here the general contractor, 'stood in the shoes of the [immediate] employer by reason of his retention of control of the premises.' Even a retained right to check as to compliance with specifications, and to stop construction progress for lack of compliance with specifications, our court has held, is not an exercise of control over how the actual manner in which the specifications were complied with. . . ." *Barth v. Downey Co., Inc.,* supra, at 780, 781. (footnotes and citations omitted.)

In *Luterbach v. Mochon, S., H., J., Inc.,* supra, many of the contract provisions were similar to those in the instant case. The owner-architect agreement provided,

" '4c. The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the work and to determine in general if work is proceeding in accordance with the Contract Documents.

" 'During such visits and on the basis of his observations while at the site, he will keep the Owner informed of the progress of the work, will endeavor to guard the Owner against defects and deficiencies in the work of contractors, and he will condemn work as failing to conform to the Contract Documents.

" 'The Architect shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the work. . . .' " *Luterbach v. Mochon, S., H., J., Inc.,* supra, at 6.

The owner-contractor agreement, which was referred to by the owner-architect agreement in defining certain of the architect's duties, provided,

" 'ARCHITECT'S STATUS:

" '(a) The Architect shall have general supervision and direction of the work. He is the agent of the Owner only to the extent provided in the contract documents and when in special instances he is authorized by the Owner so to act, and in such instances he shall, upon request, show the contract written authority. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the contract.' " *Luterbach v. Mochon, S., H., J., Inc., supra,* at 5.

The Luterbachs contended that the architect was an owner under the provisions of the safe place statute and that it owed a duty under the statute to maintain the job site in a safe condition. Ths court, after quoting from *Barth v. Downey Co., Inc., supra; Lemarcher v. Circle Const. Co., Inc., supra;* and *Berger v. Metropolitan Sewerage Comm., supra,* stated:

"The status of the architect as an owner is clearly refuted under the above standards by reference to the contract provisions. The general supervisory powers noted in the owner-contractor agreement cannot camouflage the limited nature of the architect's supervisory duties as set forth in the owner-architect contract. The architect is required to make only periodic visits to the site to determine whether the work is proceeding in accordance with the contract. And he is not responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the work. His power to halt the work if need be is not enough to demonstrate the requisite control required to prove ownership status." *Luterbach v. Mochon, S., H., J., Inc., supra,* at 10.

We conclude that the trial court correctly decided the issues before it and the judgment is affirmed.

*By the Court.*—Judgment affirmed.