**2026 WI 12**

# Supreme Court of Wisconsin



ESTATE OF CAROL LORBIECKI, et al.,
*Plaintiffs, Respondents, Cross-Appellants,*

*v.*

PABST BREWING COMPANY, et al.,
*Defendant, Appellant, Cross-Respondent-Petitioner.*

No. 2022AP723
Decided April 15, 2026

REVIEW of a decision of the Court of Appeals
Milwaukee County Circuit Court (Christopher R. Foley, J.) No.
2018CV4971

REBECCA FRANK DALLET, J., delivered the majority opinion of the Court, in which JILL J. KAROFSKY, C.J., and BRIAN K. HAGEDORN, JANET C. PROTASIEWICZ, and SUSAN M. CRAWFORD, JJ., joined. REBECCA FRANK DALLET, J., filed a concurring opinion, in which BRIAN K. HAGEDORN, J., joined. ANNETTE KINGSLAND ZIEGLER, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, J., joined.

¶1 REBECCA FRANK DALLET, J. Gerald Lorbiecki was diagnosed with and later died of mesothelioma caused by exposure to airborne asbestos. Before his death, he brought suit alleging that some of the asbestos exposure occurred while he worked for an independent contractor installing and repairing asbestos-insulated pipes at the Pabst Brewing Company's brewery. A jury agreed, finding Pabst liable for negligence for breaching the heightened duty of care imposed by Wisconsin's safe-place

statute, WIS. STAT. § 101.11 (2017–18),[1] and awarding Lorbiecki[2] compensatory and punitive damages.

¶2    Pabst argues that it is entitled to judgment as a matter of law because it cannot be held liable to Lorbiecki under the safe-place statute, that there was insufficient evidence to submit the question of whether to award punitive damages to the jury, and that the court of appeals misapplied the statutory cap on punitive damages in WIS. STAT. § 895.043(6). We hold that Pabst is not entitled to judgment as a matter of law and that there was sufficient evidence to submit the punitive-damages question to the jury.  We further hold that the court of appeals misapplied the cap on punitive damages in § 895.043(6). Accordingly, we affirm in part and reverse in part the court of appeals' decision.

I

¶3    From the 1970s to the 2000s, Lorbiecki was a steamfitter and member of the Steamfitters Union, Local 601. Over his decades-long career, independent contractors and businesses hired Lorbiecki to install and repair pipes at their facilities. One such facility was the Pabst brewery,[3] where Lorbiecki was employed by an independent contractor in the mid-1970s.

¶4    At the Pabst brewery, steamfitters cut out existing insulated pipes and replaced them. As Pabst's corporate representative explained, the brewery contained "many miles" of asbestos-insulated pipe, and according to expert testimony, "thousands of pounds of insulation [would have to]

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017–18 version unless otherwise indicated.

[2] Lorbiecki died before trial, and his estate and his wife, Carol Lorbiecki (individually and as his personal representative), were substituted as plaintiffs. *See* WIS. STAT. § 803.10(1)(a). While the case was on appeal, Carol Lorbiecki died, and the couple's son, Scott Lorbiecki, was substituted as plaintiff individually and as personal representative of Gerald's estate. *See Wheeler v. Gen. Tire & Rubber Co.*, 142 Wis. 2d 798, 806–07, 419 N.W.2d 331 (Ct. App. 1987); *see also* § 803.10(1)(a). For simplicity, we refer to the plaintiff as "Lorbiecki" throughout this opinion.

[3] The parties refer to the facility at times as the "bottle house," "bottling house," and "brewery." For consistency, we refer throughout to Pabst's brewery.

be[] torn off of pipes in a major repair job." When Lorbiecki worked there, he and the other steamfitters did that by chipping the insulation off the existing pipes using "a hammer or chisel, a saw, whatever you had in your hand; a screwdriver, [or] pocket knife." That method caused dust from the insulation to become airborne and "fly[] around."

¶5 Pabst knew that pipe insulation in the brewery contained asbestos. In the 1960s and 1970s, Sprinkmann Sons, the brewery's exclusive contractor for insulation, made weekly deliveries of asbestos-containing insulation. Between 1963 and 1974 alone, Sprinkmann's records reflect "hundreds of pounds, thousands of feet of asbestos-containing insulation going into the bottle house." Although new asbestos pipe insulation was banned in 1975, Pabst has no documentation of asbestos abatement prior to the early 1990s. As late as 1986, Pabst was cited by the Occupational Health and Safety Administration (OSHA) for broken asbestos pipe insulation found in its brewery.

¶6 Pabst also knew that airborne asbestos caused serious illness years before Lorbiecki worked there. By June 1971, both OSHA and the Wisconsin Industrial Commission promulgated regulations identifying asbestos as harmful to human health. Pabst summarized the OSHA regulations in an internal memorandum in June 1971 that specifically identified asbestosis as an occupational illness. Later that year, Pabst circulated a memorandum to outside contractors working for the company that made clear that OSHA regulations applied at its facility. That same memorandum required outside contractors to notify Pabst before "weld[s] or cut[s]" were made in the brewery "so that all necessary precautions are taken to prevent a fire or explosion in and around our plant," and stated that "[a]reas where work is being done will be inspected daily."

¶7 In 2017, Lorbiecki was diagnosed with mesothelioma, a potentially deadly asbestos-related cancer. He brought suit against Pabst and many other businesses and independent contractors for whom he worked during his career, alleging that they were negligent in failing to prevent him from being exposed to airborne asbestos, and that their failure to do so caused his illness.[4] As to Pabst, Lorbiecki's negligence claim took two forms. First, he alleged that Pabst was liable for common-law

---

[4] Over the course of the litigation, Lorbiecki's claims against all defendants except Pabst were dismissed.

negligence because it violated the duty of ordinary care. Second, he alleged that Pabst was liable for negligence under the safe-place statute, which imposes a heightened duty of care. *See* § 101.11.

¶8      Pabst moved for summary judgment, arguing that Lorbiecki's negligence claims failed as a matter of law. Specifically, Pabst contended that it owed no duty to Lorbiecki because he was an employee of an independent contractor and Pabst did not control his work. The circuit court granted Pabst's motion only as to the common-law negligence claim, concluding that under *Tatera v. FMC Corporation*, the company did not owe Lorbiecki the common-law duty of ordinary care because he was "an independent contractor's employee . . . performing the contracted work," there was no "affirmative act of negligence committed by [Pabst]," and Lorbiecki's work was not "extrahazardous." *See* 2010 WI 90, ¶¶16, 18, 328 Wis. 2d 320, 786 N.W.2d 810. Lorbiecki's claim under the safe-place statute survived, however, because the circuit court held that *Tatera* "does not immunize Pabst" from violations of the heightened duty imposed by the safe-place statute, and genuine issues of material fact precluded granting summary judgment.[5]

¶9      Lorbiecki passed away prior to trial, and direct evidence of what he did at Pabst was unavailable as a result. Nonetheless, one of Lorbiecki's fellow steamfitters, Larry Schroeder, testified that the two worked together for about four months at Pabst's brewery in the mid-1970s. Although the two men worked for different independent contractors at the time, Schroeder testified that steamfitters generally work in similar conditions and do similar tasks, specifically removing and replacing insulated pipes, and that they would have done so using the common methods of the time, which caused asbestos-containing insulation to become airborne. Additionally, Schroeder noted that around the time he and Lorbiecki worked at the Pabst facility, he saw insulation marked as containing asbestos. The jury also heard the evidence described previously about the deliveries of asbestos-containing insulation to Pabst's brewery and the company's knowledge of the dangers posed by airborne asbestos,

---

[5] Following oral argument on Pabst's motion for summary judgment, the circuit court observed that "asbestos in the air . . . is an unsafe condition under the Safe Place Statute," and explained that, based on the evidentiary record at that time, "the Safe Place Statute claim . . . survives."

as well as expert testimony about how exposure to airborne asbestos can cause mesothelioma.

¶10 At the close of Lorbiecki's case, Pabst moved for judgment as a matter of law, arguing that the evidence was insufficient for a reasonable jury to find the company liable under the safe-place statute or to award punitive damages. *See* WIS. STAT. § 805.14(3). The circuit court disagreed, explaining that Schroeder's testimony was "devastating to Pabst." There was a "clear potentially-reasonable inference" of liability, according to the circuit court, "from Mr. Schroeder's testimony in the context of" the many deliveries of asbestos-containing insulation to Pabst's brewery, and the company's knowledge of the dangers of airborne asbestos. Additionally, the circuit court held that a reasonable jury could find by clear and convincing evidence that Pabst "engaged in a deliberate course of conduct indifferent to the right of Mr. Lorbiecki and others to a safe work environment," and thus award punitive damages. *See* § 895.043(3). Accordingly, the circuit court denied Pabst's motion.

¶11 The jury found in Lorbiecki's favor, concluding that Pabst's "negligence in violating the [s]afe [p]lace [s]tatute" was "a cause of Mr. Lorbiecki's mesothelioma," and awarded compensatory and punitive damages. In total, the jury concluded that $6,545,163.55 would "fairly and reasonably" compensate for all of Lorbiecki's injuries, but found that most of those injuries were caused by the negligence of four other non-party companies: Sprinkmann, Wisconsin Electric Power Company (WEPCO), Butters-Fetting Company, and Grunau Company.[6] The jury apportioned 22% liability to Pabst, 20% to Sprinkmann, 22% to WEPCO, and 18% each to Butters-Fetting and Grunau. Finally, the jury determined that Pabst acted "in an intentional disregard of the rights of . . . Lorbiecki," and awarded $20 million in punitive damages.

¶12 Pabst moved for judgment notwithstanding the verdict, once again arguing that a reasonable jury could not have found it liable under the safe-place statute or awarded punitive damages. *See* § 805.14(5)(b). The circuit court rejected those arguments and, based on the non-delegable nature of the duty imposed by the safe-place statute, imputed

---

[6] Three of these companies, WEPCO, Butters-Fetting, and Grunau, were initially named as defendants and subsequently dismissed by Lorbiecki pursuant to stipulations. Sprinkmann was never a named party.

Sprinkmann's 20% liability to Pabst.[7] *See Barry v. Emps. Mut. Cas. Co.*, 2001 WI 101, ¶42, 245 Wis. 2d 560, 630 N.W.2d 517. It also applied the cap on loss-of-society and companionship damages in WIS. STAT. § 895.04(4), reducing the total amount of compensatory damages found by the jury to $5,545,163.55, and allocated 42% of that amount to Pabst for a total of $2,328,968.69. The circuit court concluded that punitive damages were capped by § 895.043(6) at two times the total amount of the compensatory damages recovered against Pabst, the sole remaining defendant, or $4,657,937.38. Accordingly, the circuit court entered judgment against Pabst in the amount of $6,986,906.07.

## II

¶13    Pabst seeks review of the circuit court's denial of its motions for summary judgment, judgment as a matter of law, and judgment notwithstanding the verdict. *See* WIS. STAT. §§ 802.08(2); 805.14(3), (5)(b). Pabst's appeal of the denial of summary judgment might appear to be barred by our older cases, which state that "a party who proceeds to trial waives the right to appeal . . . an order denying his earlier motion for summary judgment." *Wittke v. State ex rel. Smith*, 80 Wis. 2d 332, 345, 259 N.W.2d 515 (1977); *see also Richie v. Badger State Mut. Cas. Co.*, 22 Wis. 2d 133, 137–38, 125 N.W.2d 381 (1963). We conclude that this rule no longer applies, however, because the legislature subsequently modified the statutes governing appeals, adopting WIS. STAT. § (Rule) 809.10(4). That statute makes clear that an appeal after a final judgment "brings before the [appellate] court all prior nonfinal judgments, orders and rulings adverse to the appellant and favorable to the respondent . . . not previously appealed and ruled upon." *Id.* This includes orders denying motions for summary judgment, and therefore Pabst's appeal of the denial of its motion for summary judgment is properly before us. *See Mani v. Selective Ins. Co.*, 2026 WI App 6, ¶18 n.9, ___ Wis. 2d ___, ___ N.W.3d ___ (2026) (explaining that "under WIS. STAT. § 809.10(4), a party is not required to seek interlocutory review of a nonfinal judgment or order . . . to preserve its right to appeal from those nonfinal judgments or orders after a subsequent final judgment or order is entered").

---

[7] Pabst challenged this decision before the court of appeals, but no longer makes that argument before this court. *See Lorbiecki v. Pabst Brewing Co.*, 2024 WI App 33, ¶¶51–56, 412 Wis. 2d 641, 8 N.W.3d 821.

¶14 We review the circuit court's denial of Pabst's motions for summary judgment, judgment as a matter of law, and judgment notwithstanding the verdict de novo. *See Summers v. Touchpoint Health Plan, Inc.*, 2008 WI 45, ¶15, 309 Wis. 2d 78, 749 N.W.2d 182; *Danner v. Auto-Owners Ins.*, 2001 WI 90, ¶41, 245 Wis. 2d 49, 629 N.W.2d 159; *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995). Pabst also argues that there was insufficient evidence to submit the question of whether to award punitive damages to the jury, and that the court of appeals misapplied the cap on punitive damages in § 895.043(6). These arguments raise questions of law, which we also review de novo. *See Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WI 26, ¶32, 279 Wis. 2d 4, 694 N.W.2d 320; *SEIU Healthcare Wis. v. WERC*, 2025 WI 29, ¶5, 416 Wis. 2d 688, 22 N.W.3d 876.

III

¶15 Pabst's primary argument, first raised at summary judgment and reiterated in its motions for judgment as a matter of law and judgment notwithstanding the verdict, is that it cannot be held liable to Lorbiecki as a matter of law under the safe-place statute.[8] If we disagree, however, Pabst

---

[8] Pabst's sole argument on appeal regarding the circuit court's denial of summary judgment is a purely legal, not factual, one. It contends that, as a matter of law, the duty imposed by the safe-place statute does not extend to Lorbiecki. This legal contention was repeated in the company's motions for judgment as a matter of law and judgment notwithstanding the verdict and on appeal, and for the reasons set forth below, we reject it. In support of their respective positions on this purely legal question, Pabst and Lorbiecki each draw on both the pre-trial and trial records, and do not develop any argument that we should limit our review of the denial of summary judgment only to the factual record that existed before trial. *See Doe 1 v. Madison Metro. Sch. Dist.*, 2022 WI 65, ¶35, 403 Wis. 2d 369, 976 N.W.2d 584 ("We do not step out of our neutral role to develop or construct arguments for parties." (quoting another source)). Indeed, neither party suggests there is any material difference between the factual records at the time of summary judgment and after trial. Accordingly, we consider the entire evidentiary record in analyzing the parties' arguments. In doing so, however, we express no view regarding the appropriate factual record to consider when, after a trial has taken place, an appellate court reviews a pre-trial order denying a motion for summary judgment. *See Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (holding that, under federal law, "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion.").

further contends that the circuit court erred in submitting the question of whether to award punitive damages to the jury because the evidence showed only negligence, not the requisite malice or intentional disregard of Lorbiecki's rights. *See* § 895.043(3). Finally, Pabst asserts that the court of appeals erred in its application of the punitive-damages cap in § 895.043(6).

A

¶16    We begin with Pabst's claim that it cannot be held liable to Lorbiecki as a matter of law under the safe-place statute. Although Pabst makes several arguments to this effect, all are unavailing.

¶17    The safe-place statute is a unique feature of Wisconsin law, enacted during the Progressive Era as a complement to Wisconsin's first-in-the-nation comprehensive workers' compensation law. *See Sadowski v. Thomas Furnace Co.*, 157 Wis. 443, 447, 146 N.W. 770 (1914); *see also* John A. Becker & Chris G. Halverson, WISCONSIN SAFE-PLACE LAW 1, 4–7 (3d ed. 2022). Rather than create a new cause of action, the safe-place statute "instead establishes a duty greater than that of ordinary care imposed" on negligence claims "at common law." *Barry*, 245 Wis. 2d 560, ¶18 (citations omitted). It does so by providing that "[e]very employer . . . shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe," and that "[e]very employer and every owner of a place of employment or a public building . . . shall so construct, repair or maintain such place of employment or public building as to render the same safe." § 101.11(1). In this context "safe" means "such freedom from danger to the life, health, safety or welfare of employees or frequenters . . . as the nature of the employment, place of employment, or public building, will reasonably permit." WIS. STAT. § 101.01(13).

¶18    "[T]he statute imposes three duties on employers and owners of places of employment or public buildings: the duty to construct, to repair, and to maintain a safe place of employment or public building." *Barry*, 245 Wis. 2d 560, ¶20. These duties are non-delegable, meaning that an employer or owner "cannot assert that another to whom he has allegedly delegated the duty is to be substituted as the primary defendant in his stead for a violation of safe place provisions." *Dykstra v. Arthur G. McKee & Co.*, 100 Wis. 2d 120, 132, 301 N.W.2d 201 (1981). The safe-place statute imposes an "ongoing duty to keep premises safe," and is not limited to only the

initial construction of the premises or the time an individual first arrives there. *Mair v. Trollhaugen Ski Resort*, 2005 WI App 116, ¶7, 283 Wis. 2d 722, 699 N.W.2d 624. And the duties imposed by the safe-place statute extend not just to employees but also to "frequenters," a category that includes employees of independent contractors working on the premises. *See Barth v. Downey Co., Inc.*, 71 Wis. 2d 775, 778, 239 N.W.2d 92 (1976).

¶19 Pabst first asserts that even though the heightened duty imposed by the safe-place statute extends to "frequenters" like Lobriecki, it cannot be held liable because the "general rule" in *Tatera v. FMC Corporation* applies. That rule states that "a principal employer is not liable in tort for injuries sustained by an independent contractor's employee while he or she is performing the contracted work." *See Tatera*, 328 Wis. 2d 320, ¶2 (footnote omitted). This "general rule," Pabst says, applies to all negligence claims, both ones based on the common-law duty of ordinary care and those premised on the heightened duty imposed by the safe-place statute. And because none of the exceptions identified in *Tatera* applies,[9] this "general rule" bars Lorbiecki's claim.

¶20 *Tatera*'s "general rule" does not apply, however, to claims under the safe-place statute. *Tatera* was a common-law negligence case, and the "general rule" it applied is one about the common-law duty of ordinary care, not the heightened duty of care imposed by the safe-place statute. *See Tatera*, 328 Wis. 2d 320, ¶¶15–16; *see also Anderson v. Proctor & Gamble Paper Prods. Co.*, 924 F. Supp. 2d 996, 1003 (E.D. Wis. 2013) ("Where the safe place statute applies, it supersedes the common law duty of reasonable care discussed and applied in *Tatera*."). Neither *Tatera* nor the cases on which it relied for its "general rule" cited or discussed the safe-place statute. *See, e.g., Wagner v. Cont'l Cas. Co.*, 143 Wis. 2d 379, 400–01, 421 N.W.2d 835 (1988); *Estate of Thompson v. Jump River Elec. Co-op.*, 225 Wis. 2d 588, 593–94, 593 N.W.2d 901 (Ct. App. 1999). And despite Pabst's argument otherwise, we have never applied *Tatera*'s "general rule" to a claim under the safe-place statute. *See, e.g., Carlson v. Chi. & Nw. Ry. Co.*, 185 Wis. 365, 370–71, 200 N.W. 669 (1924); *Potter v. City of Kenosha*, 268 Wis. 361, 372, 68 N.W.2d 4 (1955); *Barth*, 71 Wis. 2d at 778–79; *Stefanovich v. Iowa Nat'l Mut. Ins. Co.*, 86

---

[9] *Tatera* identified two exceptions, claims "pertain[ing] to an affirmative act of negligence committed by the principal employer" and injuries occurring during "contracted work that qualifies as extrahazardous." *See* 328 Wis. 2d 320, ¶18. Neither Pabst nor Lorbiecki argue that these exceptions apply here.

Wis. 2d 161, 169, 271 N.W.2d 867 (1978); *Hortman v. Becker Constr. Co., Inc.*, 92 Wis. 2d 210, 227, 284 N.W.2d 621 (1979).

¶21   On the contrary, the cases Pabst cites instead apply an exception to liability under the safe-place statute. That exception is stated most clearly in *Potter v. City of Kenosha*, which held that there is no liability under the safe-place statute for injuries sustained by an independent contractor's employees if a property owner turns over "complete control and custody of a safe place" to the independent contractor and does not retain the right to supervise or control the independent contractor's work. *See* 268 Wis. at 372; *see also Carlson*, 185 Wis. at 370–71; *Barth*, 71 Wis. 2d at 778–79; *Hortman*, 92 Wis. 2d at 227. In *Potter*, we concluded that this exception applied when the City of Kenosha turned over a "safe, empty street" to a contractor to build a sewer. 268 Wis. at 374. The City "merely designated the place where the sewer was to be located and fixed the standard of quality and quantity of construction that it desired," otherwise turning over complete responsibility for the place and work to be performed to the contractor. *See id.* at 372. Under those circumstances, we held that the City could not be held liable under the safe-place statute for the death of a worker caused by the collapse of a trench built by the contractor as part of the sewer-construction process. *See id.*

¶22   Relying on *Potter*, Pabst claims that it cannot be held liable to Lorbiecki because it did not control his work. To fall within *Potter*'s exception to liability under the safe-place statute, however, Pabst must demonstrate both (1) that it did not control Lorbiecki's work, *and* (2) that it turned over "control and custody of" the place where the work was to be performed, in a safe condition.[10] *See Potter*, 268 Wis. at 372; *see also Anderson*, 924 F. Supp. 2d at 1003–04 ("Under the safe place statute, an owner is only absolved of its statutory duty if it relinquishes complete control of the premises to the contractor, and the premises are in a safe condition at that time."). As Lorbiecki points out, even if Pabst is right that it did not control his work, it could still be held liable under the safe-place statute if a

---

[10] As *Potter* and other cases make clear, the turnover of complete "control and custody" need only be of the place where the contractor works, not necessarily the entire premises. *See, e.g., Potter*, 268 Wis. at 372 (examining whether the City of Kenosha relinquished "control and custody" of the area where a sewer was to be constructed, not the entire city); *Anderson*, 924 F. Supp. 2d at 1003–04 (focusing on whether the owner relinquished "control over the work site," not the entire paper mill).

reasonable jury could find that it retained control over the place where the work was to be performed "beyond mere legal ownership or right of inspection." *See Kaltenbrun v. City of Port Washington*, 156 Wis. 2d 634, 647, 457 N.W.2d 527 (Ct. App. 1990); *see also Anderson*, 924 F. Supp. 2d at 1003–04. As we have previously stated, control of the premises "need not be exclusive, nor is it necessary to have control for all purposes," in order to be held liable. *Schwenn v. Loraine Hotel Co.*, 14 Wis. 2d 601, 607, 111 N.W.2d 495 (1961); *see also Potter*, 268 Wis. at 373 ("[W]hen an owner employs several distinct contractors in the construction of a building, the owner is deemed to have retained such control and custody of the premises as to make him responsible for them." (citing *Waskow v. Robert L. Reisinger & Co.*, 180 Wis. 537, 544, 193 N.W. 357 (1923))).

¶23     We agree with Lorbiecki that a reasonable jury could find that Pabst retained control over the place where he worked.[11] Pabst owned the brewery and, beyond its statement that "[a]reas where work is being done will be inspected daily," its memorandum to outside contractors imposed safety and sanitation requirements on contractors and mandated notification to Pabst "whenever the contractors' employees [were] going to weld or cut, so that all necessary precautions are taken to prevent a fire or explosion in and around [Pabst's] plant."

¶24     Pabst nevertheless contends that the statements about notification of "weld[s] or cut[s]" "shows that the independent contractor, not Pabst, chose where the welds and cuts would be and—more importantly—*how* to make the welds and cuts." As Lorbiecki argues, however, this demonstrates at best that Pabst did not control Lorbiecki's or other contractors' work, not that it did not retain control over the place where the work was to be performed. The memo makes clear that Pabst

----

[11] The jury was given Wisconsin Jury Instruction—Civil 1911, which states in relevant part that "[b]efore a person has a duty to furnish a safe place of employment, the person must have the right to present control over the place so that the person can perform the duty to furnish a safe place of employment." The instruction goes on to explain that "[t]his control of the premises need not be exclusive, nor is it necessary to have control for all purposes." Although Pabst objected to giving the instruction in the circuit court, it did not appeal the circuit court's decision to either the court of appeals or this court, nor did it appeal the circuit court's refusal to give an instruction Pabst wrote entitled "Landowner's Liability to an Employee of an Independent Contractor." Accordingly, the circuit court's jury-instruction decisions are not before us.

needed to be notified of the welds or cuts in advance "to prevent a fire or explosion in and around the plant." Given that, and the fact that steamfitters' duties included cutting out existing pipes in the brewery, the jury could have inferred the following: that Pabst retained the right to dictate whether cuts or welds would take place, where and when they would happen, and thus that the company retained control over the place where Lorbiecki worked "beyond mere . . . ownership or right of inspection." *See Kaltenbrun*, 156 Wis. 2d at 647; *see also Beacon Bowl, Inc. v. Wis. Elec. Power Co.*, 176 Wis. 2d 740, 788, 501 N.W.2d 788 (1993) (explaining that motions for judgment as a matter of law should be granted only if, "'considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made," there is no credible evidence on which a jury could find in that party's favor (quoting another source)); *see also Tews v. NHI, LLC*, 2010 WI 137, ¶79, 330 Wis. 2d 389, 793 N.W.2d 860 ("[S]ummary judgment should not be granted if reasonable, but differing, inferences can be drawn from the undisputed facts." (quoting another source)). This evidence distinguishes this case from *Potter*, where the City of Kenosha turned over complete control to an independent contractor of the area where work was to be performed, and retained only a limited right of inspection. *See Potter*, 268 Wis. at 372.

¶25　Pabst's final assertion is that a reasonable jury could not find that an "unsafe condition" existed in the brewery because undisturbed asbestos is not itself dangerous. *See Barry*, 245 Wis. 2d 560, ¶¶20–23 (explaining that liability under the safe-place statute may be founded on an "unsafe condition associated with the structure"). But Lorbiecki's contention from summary judgment through trial was that airborne asbestos, not undisturbed asbestos, was the unsafe condition that caused his injuries.[12] We conclude that a reasonable jury could find that Lorbiecki was exposed to the unsafe condition of airborne asbestos at Pabst's brewery.

---

[12] For example, in his summary judgment briefing, Lorbiecki argued that the evidence, including deposition testimony, supported a reasonable inference that "[t]he removal of insulation, whether by Mr. Lorbiecki or another individual working in close proximity to Mr. Lorbiecki, created [asbestos-containing] dust which Mr. Lorbiecki breathed," and that this inference was bolstered by Schroeder's testimony that the steamfitters' "clothing would often be dusty as a result of the dust generated from work that they performed, and the work performed by others."

¶26 The record here demonstrates that before Lorbiecki worked there, Pabst knew "many miles of" pipes in its facility were insulated with asbestos, and that airborne asbestos was dangerous to human health. While undisturbed asbestos is not itself dangerous, Lorbiecki's expert testified that steamfitters would have to remove "thousands of pounds of insulation . . . [from] pipes in a major repair job." The jury could have inferred that Pabst knew by virtue of its inspections and control over "weld[s] or cut[s]" that steamfitters, including Lorbiecki, performed that work using the common method of the time, which involved chipping the existing insulation off pipes in a way that caused dust to "fly[] around." Yet there was no evidence, for example, that Pabst required the use of methods to reduce the amount of airborne asbestos, or engaged in asbestos remediation prior to the 1990s. On the basis of this evidence, a reasonable jury could have concluded that Lorbiecki was exposed to an unsafe condition—airborne, not undisturbed, asbestos—during his work at Pabst, and that the company had notice of that unsafe condition. Indeed, the court of appeals and a federal district court have come to similar conclusions on the basis of comparable evidence. *See, e.g.*, *Anderson*, 924 F. Supp. 2d at 999–1000, 1003 (concluding that working "in close proximity to pipefitters" who removed and cut pipe insulation, "creat[ing] a 'plume of cloud dust'" could support a safe-place-statute claim); *Viola v. Wis. Elec. Power Co.*, 2014 WI App 5, ¶25, 352 Wis. 2d 541, 842 N.W.2d 515 (Ct. App. 2013) (holding that exposure to airborne asbestos caused by "regular maintenance and/or repair of the premises" "in some instances by the decedent while performing work in the usual way" with knowledge of the owner could give rise to liability under the safe-place statute); *Calewarts v. CR Meyer & Sons Co.*, No. 2011AP1414, unpublished slip op., ¶¶7–8, 24, 27 (Wis. Ct. App. July 3, 2012) (determining that a reasonable jury could find an unsafe condition existed on the basis of "evidence that . . . [asbestos-containing] insulation was regularly disturbed or released by pipe repairs, vibrations, and impacts in the course of work . . .").

¶27 Moreover, this conclusion is consistent with our decision in *Neitzke v. Kraft-Phenix Dairies, Inc.*, 214 Wis. 441, 253 N.W. 579 (1934), which held that an owner could be liable under the safe-place statute for injuries to an independent contractor's employee caused by electrical coils, even though those coils were "harmless . . . to [the owner's] employees because of their elevation and removal from likelihood of employees or frequenters coming in contact with them." *Id.* at 448. The coils, we explained, "became a real and immediate danger when work was inaugurated which placed the coils in the probable line of operation" of the independent contractor's employee using "customary methods" for his work. *Id.* Like the coils in

*Neitzke*, undisturbed asbestos is not dangerous. Nevertheless, a reasonable jury could have concluded that it became "a real and immediate danger" through the course of the steamfitters' work which, by their "customary methods" of the time—methods that a reasonable jury could have determined Pabst was aware of—involved disturbing the asbestos and causing it to become airborne. *See id.*

¶28    Accordingly, we hold that a reasonable jury could find Pabst liable to Lorbiecki under the safe-place statute, and thus reject Pabst's argument that the circuit court should have granted the company's motions for summary judgment, judgment as a matter of law, and judgment notwithstanding the verdict. As the owner of the brewery, Pabst owed a non-delegable duty under the safe-place statute to frequenters on the premises, a category that includes employees of independent contractors like Lorbiecki. *See Barth*, 71 Wis. 2d at 778. That duty supersedes the common-law duty of ordinary care, and thus the "general rule" in *Tatera* limiting liability to employees of independent contractors does not apply. *See Anderson*, 924 F. Supp. 2d at 1003. Likewise, a reasonable jury could have rejected Pabst's contention that it was not liable because it turned over "complete control and custody of a safe place" to the independent contractor. *Potter*, 268 Wis. at 372. A reasonable jury could also find that an "unsafe condition associated with the structure"—airborne asbestos—existed on the premises, that Pabst knew about it, that Pabst failed to maintain or repair the premises to be as safe as its nature would reasonably permit, and that the failure to do so caused Lorbiecki's injuries. *See Barry*, 245 Wis. 2d 560, ¶23; *see also Anderson*, 924 F. Supp. 2d at 1003; *Neitzke*, 214 Wis. at 448. For these reasons, we conclude that Pabst is not entitled to judgment as a matter of law on Lorbiecki's claim under the safe-place statute.

B

¶29    Next, Pabst argues that there was insufficient evidence to submit the question of whether to award punitive damages to the jury. Punitive damages may be awarded "if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." § 895.043(3). In the circuit court and on appeal, Lorbiecki relied on the second part of that statute, contending that punitive damages were available because Pabst acted "in an intentional disregard of" his rights. *Id.*

¶30    We have repeatedly emphasized that punitive damages are not available for mere negligence. *See, e.g., Strenke v. Hogner*, 2005 WI 25, ¶42, 279 Wis. 2d 52, 694 N.W.2d 296; *Wischer*, 279 Wis. 2d 4, ¶31. Punitive damages are available in negligence cases "[o]nly when the wrongdoer's conduct is so aggravated that it meets the elevated standard of an 'intentional disregard of rights.'" *Wischer*, 279 Wis. 2d 4, ¶31. An "intentional disregard of rights" occurs when "the defendant act[s] with a purpose to disregard the plaintiff's rights or [is] aware that his or her conduct is substantially certain to result in the plaintiff's rights being disregarded." *Strenke*, 279 Wis. 2d 52, ¶36. "[A] question on punitive damages may not be given to the jury unless the trial court concludes that a reasonable jury could find from the evidence that entitlement to punitive damages has been proven by the middle burden of proof, 'clear and convincing evidence.'" *Id.*, ¶41 (quoting another source).

¶31    In *Wischer*, we held that these standards were met when a jury awarded punitive damages for injuries and deaths caused when a crane collapsed in high winds. *Wischer*, 279 Wis. 2d 4, ¶8. Evidence submitted at trial demonstrated that the defendant was aware of the potential danger posed by high winds, knew the maximum safe wind speed for operating the crane, and nonetheless directed its use on several occasions without calculating the wind speed or taking additional precautions. *See id.*, ¶57. This evidence, we held, provided a sufficient basis for the jury to find by clear and convincing evidence that the defendant's conduct was "substantially certain to result in the plaintiffs' rights being disregarded." *See Wischer*, 279 Wis. 2d 4, ¶58.

¶32    Pabst argues that punitive damages are not available here because it at worst "fail[ed] to warn," and there was no evidence it engaged in "an affirmative act" in disregard of Lorbiecki's rights. According to Pabst, such an affirmative act is necessary because we held in *Strenke* that an "intentional disregard of the rights of the plaintiff," § 895.043(3), occurs when "the defendant *act*[*s*] with a purpose to disregard the plaintiff's rights or [is] aware that his or her conduct is substantially certain to result in the plaintiff's rights being disregarded." *Strenke*, 279 Wis. 2d 52, ¶36 (emphasis added). But we have never held, in *Strenke* or any other case, that an "affirmative" act is required for the jury to find intentional disregard of the plaintiff's rights and thus to award punitive damages. *See id.* Indeed, some of the facts we cited as supporting the punitive-damages award in *Wischer*—for example, the failure to perform wind speed calculations or take additional precautions—might be characterized as non-"affirmative" acts. *See Wischer*, 279 Wis. 2d 4, ¶¶57–58. And in any case, the failure to

engage in an "affirmative act" can fall within the second type of "intentional disregard" *Strenke* identified if the defendant had a duty to act and deliberately failed to do so with an "aware[ness] that his or her conduct [wa]s substantially certain to result in the plaintiff's rights being disregarded." *Strenke*, 279 Wis. 2d 52, ¶36.

¶33    That is what Lorbiecki alleges happened here. Pabst had a non-delegable duty under the safe-place statute to "maintain a safe place of employment or public building" free from "unsafe conditions associated with the structure." *Barry*, 245 Wis. 2d 560, ¶¶20–21 (quoting another source); *see also supra*, Part III.A. The jury heard evidence that Pabst was "aware" of an unsafe condition—airborne asbestos in the brewery—and that it caused serious illness. *See Strenke*, 279 Wis. 2d 52, ¶36. Additionally, the jury was presented evidence indicating that Lorbiecki and other workers like him were exposed to airborne asbestos in the course of their work, and could infer from the company's statements about daily inspections and notification of "cut[s] or weld[s]" that the company knew the exposure was happening. *See State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990) (noting that a jury's finding "may rest upon evidence that is entirely circumstantial"). Yet, rather than take steps to protect workers, the jury could have concluded that the company continued to purchase more asbestos insulation, failed to warn workers or adopt additional safety protocols, did not engage in asbestos remediation for many years, and was cited by OSHA in 1986 for having broken asbestos-containing pipe insulation in the brewery. This evidence provided a sufficient basis on which the jury could find by clear and convincing evidence that Pabst was, at a minimum, "aware that [its] conduct [wa]s substantially certain to result in [Lorbiecki's] rights being disregarded." *See Strenke*, 279 Wis. 2d 52, ¶36. Accordingly, we hold that the circuit court properly submitted the question of whether to award punitive damages to the jury.

C

¶34    Finally, Pabst argues that the court of appeals misapplied the cap on punitive damages in § 895.043(6). That statute provides that "[p]unitive damages received by the plaintiff may not exceed twice the amount of any compensatory damages recovered by the plaintiff or $200,000, whichever is greater." The issue is whether "the amount of any compensatory damages *recovered by the plaintiff*" in this case is the $5,545,163.55 in compensatory damages the jury apportioned among all alleged tortfeasors—Pabst and four non-party companies, WEPCO,

Sprinkmann, Butters-Fetting, and Grunau—or just the $2,328,968.69 in compensatory damages for which Pabst, the sole remaining defendant at trial, was responsible.[13]

¶35    Pabst argues for a narrow rule that "compensatory damages recovered by the plaintiff," *see* § 895.043(6), "does not include unrecoverable compensatory damages." As Pabst emphasizes, it was the sole remaining defendant at trial. Although the jury heard evidence at trial about the four non-party companies, it did so only for the limited purpose of determining Pabst's liability. Thus, even though the verdict included a total of $5,545,163.55 in compensatory damages attributable to the actions of the alleged tortfeasors, most of that amount was unrecoverable as a matter of law, since the sole remaining defendant at trial was Pabst. Pabst therefore concludes that because it was the sole remaining defendant, the only compensatory damages Lorbiecki could be legally entitled to receive by prevailing in the case and obtaining a final judgment was the $2,328,968.69 for which Pabst was legally responsible. And as a result, punitive damages should be capped at two times that amount. *See* § 895.043(6).

¶36    We agree with Pabst.[14] Although § 895.043(6) does not define the word "recovered," its usage elsewhere in chapter 895 confirms that it refers only to money or property a plaintiff is legally entitled to receive after prevailing in a case, and thus obtaining a judgment. *See, e.g.*, *Duncan v. Asset*

---

[13] As discussed previously, the damages the jury apportioned to Sprinkmann were imputed to Pabst based on the non-delegable nature of the duty imposed by the safe-place statute. *See supra* ¶12 & n.7. Pabst does not argue the damages apportioned to Sprinkmann and imputed to it should be excluded from the "amount of any compensatory damages recovered by the plaintiff." *See* § 895.043(6).

[14] Because we agree with Pabst's statutory interpretation, we need not address its alternative arguments that adopting a different interpretation would raise constitutional problems by punishing Pabst for others' conduct, or increase punitive damages based on compensatory damages awarded for claims like breach of contract, which do not allow punitive damages. *See DEKK Prop. Dev., LLC v. DOT*, 2023 WI 30, ¶23, 406 Wis. 2d 768, 988 N.W.2d 653 (explaining that typically we "should decide cases on the narrowest possible grounds" (quoting another source)).

*Recovery Specialists, Inc.*, 2022 WI 1, ¶¶13–14, 400 Wis. 2d 1, 968 N.W.2d 661 (reading an undefined statutory term consistently with how that term is used elsewhere in closely related statutes). For example, WIS. STAT. § 895.035, which governs the liability of parents for acts by their minor children, states that it "does not limit the amount of damages recoverable by an action against a child or children except that *any amount so recovered* shall be reduced and apportioned by the amount received from the parent or parents under this section." *See id.* (5) (emphasis added). Likewise, § 895.035(6) states that "[a]ny recovery of restitution under this section shall be reduced *by the amount recovered* as restitution for the same act" under the juvenile-restitution statutes, and "[a]ny recovery of a forfeiture under this section shall be reduced *by the amount recovered* as a forfeiture for the same act" under the juvenile-forfeiture statutes. *See id.* (emphasis added). In each of these instances, and others like them throughout chapter 895,[15] the legislature used the word "recovered" to refer specifically to amounts the plaintiff is legally entitled to receive after obtaining a judgment.

¶37    This understanding of "recovered" is also consistent with the ordinary legal usage of that term. *See, e.g.*, *Recover*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "recover" as "[t]o obtain (relief) by judgment or other legal process," or "[t]o obtain (a judgment) in one's favor"). And it is similarly consistent with the basic principle that plaintiffs cannot recover compensatory damages on the basis of a verdict alone; rather, plaintiffs may recover damages only on the basis of a judgment. *See Tucker v. Marcus*, 142 Wis. 2d 425, 439, 418 N.W.2d 818 (1988) (concluding that "the jury's finding that there had been injury suffered, and ascertainment of a sum which would fairly compensate . . . for the injury . . . did not constitute an 'award' of actual damages"). Finally, if the legislature wanted courts to consider the total amount awarded in calculating punitive-damage awards, it could easily have done so. It could, for example, have referred directly to the amount of the verdict, as it did in WIS. STAT. § 885.285(3), which ties rights of contribution between joint tortfeasors to the "*amount of the verdict prior to reduction* because of a

---

[15] *See, e.g.*, WIS. STAT. §§ 895.02 (when certain actions are "prosecuted to judgment against the personal representative, the plaintiff shall be entitled to recover only for the value of the goods taken . . . "); 895.049 ("[F]ailure . . . to use protective headgear shall not reduce recovery for injuries or damages . . . in any civil action."); 895.057 (providing that "[a]ny judicial officer" who engages in certain acts "shall be liable in a civil action . . . for the full amount of damages and costs recovered on such claim").

settlement or advance payment." *See id.* (emphasis added). But the legislature did not do so, instead using the phrase "compensatory damages recovered by the plaintiff," a phrase that, in context, includes only amounts that a plaintiff is legally entitled to receive after obtaining a judgment, and excludes amounts that the plaintiff cannot obtain as a matter of law.

¶38    It is important to note that this interpretation does not import principles of comparative negligence into the calculation of punitive damages, and is thus consistent with our prior statement that punitive damages are not damages for negligence and are "undiminished by proportional negligence." *See Tucker*, 142 Wis. 2d at 452–54; *see also* WIS. STAT. § 895.045(1) (setting forth Wisconsin's approach to comparative negligence). The outcome here, that the punitive-damages cap is tied to the amount recoverable against Pabst, follows from the fact Pabst was the only defendant at trial, and thus the only party against whom Lorbiecki could legally receive compensatory damages after obtaining a judgment. The reason Lorbiecki could not recover any of the other compensatory damages included in the verdict is not because of comparative negligence, but simply because the other alleged tortfeasors were not parties, and thus judgment could not be entered against them.

¶39    For these reasons, we hold that "the amount of any compensatory damages recovered by the plaintiff" includes only amounts that a plaintiff is legally entitled to receive after obtaining a judgment, and excludes amounts that the plaintiff cannot obtain as a matter of law. *See* § 895.043(6). Accordingly, punitive damages against Pabst are capped at $4,657,937.38.

IV

¶40    In sum, we hold that a reasonable jury could hold Pabst liable to Lorbiecki for breaching the heightened duty of care imposed by the safe-place statute, and that there was sufficient evidence to submit the question of whether to award punitive damages to the jury. We further hold that the only "compensatory damages recovered by" Lorbiecki are the $2,328,968.69 for which Pabst was legally responsible, and thus the punitive damages in this case are capped at two times that amount. *See* § 895.043(6). Accordingly, we affirm in part and reverse in part the court of appeals' decision.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part.

REBECCA FRANK DALLET, J., with whom BRIAN K. HAGEDORN, J., joins, concurring.

¶41    This case leaves an important question about appeals from the denial of summary judgment unanswered. When reviewing the denial of summary judgment on appeal, should an appellate court rely only on the pre-trial factual record developed in discovery, only on the evidence admitted at trial, or both?

¶42    The majority opinion does not answer this question because the parties did not engage with it. *See* majority op., ¶15 n.8. But the answer is important because without clear guidance about the proper record to review on appeal, litigants and courts may be unsure about the scope of appellate review, and how to frame and resolve the issues on appeal. I write separately to discuss this question further.

¶43    Summary-judgment motions occur before trial, and thus turn on whether the record developed during discovery—the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits"—contains "genuine issue[s] as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *See* WIS. STAT. § 802.08(2). For that reason, one might think that an appellate court reviewing the denial of summary judgment should rewind the clock to the moment the summary-judgment motion was decided and evaluate, based on the record that existed then, whether there were genuine issues of material fact and the moving party was entitled to judgment as a matter of law.

¶44    That is not, however, what the federal courts do. Federal courts distinguish between orders that deny summary judgment on factual grounds and those that turn on "pure questions of law." *See Dupree v. Younger*, 598 U.S. 729, 735 (2023). Denials of summary judgment on factual grounds are "unreviewable after final judgment." *Dupree*, 598 U.S. at 734 (citing *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)). That is because the facts of the case are "develop[ed] and clarif[ied] as the case progresses from summary judgment to a jury verdict." *Id.* Once a trial takes place, the summary-judgment record is superseded by the trial record; it becomes "'ancient history and is not subject to appeal.'" *Id.* (internal alteration omitted) (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 823–24 (7th Cir. 2016)). Factual challenges to the sufficiency of the evidence must therefore be raised through motions for judgment as a matter of law or judgment notwithstanding the verdict—motions that are

evaluated with reference to the trial record alone, not the pre-trial record. *Id.* at 735.

¶45 Federal courts treat summary-judgment rulings on "purely legal issues—that is, issues that can be resolved without reference to any disputed facts" differently. *Id.* at 735. Those rulings are reviewable on appeal even if the party seeking review did not raise them again at trial through a motion for judgment as a matter of law or judgment notwithstanding the verdict. *Id.* at 735–36. In reviewing such rulings, however, federal courts analyze only the legal issues, once again without reference to the pre-trial evidentiary record. *See id.* Thus, in federal court, when a denial of summary judgment is reviewable on appeal, the pre-trial evidentiary record is irrelevant. *See Ortiz*, 562 U.S. at 184.

¶46 Neither our court nor the court of appeals has had occasion to decide whether a similar rule applies in Wisconsin, and we need not do so here. Although Lorbiecki argues in passing for adopting the federal courts' approach, neither he nor Pabst contends that it would make any difference. After all, Pabst's sole challenge to the circuit court's denial of summary judgment is a purely legal one; it argues that it owed no duty to Lorbiecki under the safe-place statute. The majority opinion confines its review of the summary-judgment decision to that legal argument, and correctly rejects it. *See* majority op., ¶28. To the extent the parties draw on the facts in support of their respective positions on that purely legal issue, Pabst and Lorbiecki both rely on the pre-trial and trial records, and neither party suggests there is any meaningful difference between them. And for that reason, the majority opinion considers the whole record, while "express[ing] no view regarding the appropriate factual record to consider when, after a trial has taken place, an appellate court reviews a pre-trial order denying a motion for summary judgment." *See id.*, ¶15, n.8 (citing *Ortiz*, 562 U.S. at 184).

¶47 Nevertheless, it is important for litigants and courts to have clear guidance on what factual record to consider when the denial of summary judgment is reviewed on appeal. It is not hard to imagine a case in which the evidence at summary judgment will differ markedly from that at trial. Indeed, in such a case, it might be outcome-determinative if an appellate court is supposed to look only at the record as it existed at the time of summary judgment, or only at the trial record, or if fact-bound denials of summary judgment are unreviewable after trial. Accordingly, we should consider clarifying whether we will follow the federal courts' lead on this question, or to chart our own path.

ANNETTE KINGSLAND ZIEGLER, J., with whom REBECCA GRASSL BRADLEY, J., joins, dissenting.

## I.  INTRODUCTION

¶48    Gerald Lorbiecki's injuries, as unfortunate and horrible as they are, resulted from the work that he, as an employee of an independent contractor, performed at his employer's direction, using the expertise for which the building owner hired his employer. Before trial, Pabst moved for summary judgment based upon the well-established, foundational presumption that owners who relinquish control over safe premises to an independent contractor are not liable to an independent contractor's employee who is injured within the scope of that employee's employment. *Stefanovich v. Iowa Nat. Mut. Ins. Co.*, 86 Wis. 2d 161, 169, 271 N.W.2d 867 (1978); *Barth v. Downey Co.*, 71 Wis. 2d 775, 780–81, 239 N.W.2d 92 (1976). At summary judgment, the record was devoid of any evidence that would support the building owner's liability. As the plaintiff, Lorbiecki[1] did not carry his burden to demonstrate that the building owner could be held liable, as he did not assert that Pabst controlled his work and he failed to produce any evidence that the undisturbed asbestos at Pabst's brewery created an unsafe condition on the premises.[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (opponent to summary judgment must affirmatively demonstrate by specific factual showing that a genuine issue of fact requires trial). As a matter of law, summary judgment should have been granted. *See Bojda v. Black Dot Graphics, Inc.*, 12 F.3d 1100 (table), 1994 WL 2103 (7th Cir. Jan. 5, 1994) (requiring plaintiffs to produce at least some facts showing that a genuine dispute of fact exists to overcome summary judgment).

¶49    The majority agrees that summary judgments are appealable. However, the majority does not consider that failing to review summary judgments using the record at summary judgment effectively denies review. The majority, while claiming that summary judgments are reviewable, holds that denials of summary judgments are de facto

---

[1] For simplicity and consistency, I refer to the plaintiffs collectively as "Lorbiecki." *See* majority op., ¶1 n.2.

[2] While Lorbiecki's case could have proceeded under two exceptions to the safe-place statute, Lorbiecki pursued only one at summary judgment. *See infra*, ¶¶62–77.

unreviewable. I dissent because, under Wisconsin law, the majority should be reviewing Pabst's denied motion for summary judgment based upon the record that existed at summary judgment, not based upon the jury's verdict, and the majority errs again when it fails to correctly analyze the law regarding a building owner's liability to an independent contractor's employee as the same arguments were raised in a post-trial motion. If the majority is adopting the federal rules, it is doing so without argument or briefing.[3] In any event, observing the majority's practice in this case, future practitioners will surmise that a denied motion for summary judgment will no longer be entitled to any meaningful appellate review. Rather than assessing the parties' arguments and the record as it existed at the time of summary judgment before moving on to consider the rest of the case, the majority considers the entire record, including the jury's verdict, in reaching its conclusion. Previously, Wisconsin practitioners understood that while their denied motion for summary judgment was not entitled to an immediate appeal, eventually that denial would receive a de novo review upon appeal of the case's final judgment. By shortcutting review of

---

[3] In the federal courts, appeals of denied motions for summary judgment after a full trial on the merits are generally precluded, though the United States Supreme Court has acknowledged a possible exception for "purely legal" issues capable of resolution "with reference only to undisputed facts," like in the qualified immunity context. *Ortiz v. Jordan*, 562 U.S. 180, 188–90 (2011). And, "[o]rdinarily, orders denying summary judgment do not qualify as final decisions subject to appeal." *Id.* at 188. So, once the "court of first instance determines that a genuine dispute as to a material fact precludes immediate entry of judgment as a matter of law," a "party may [not] appeal [an order denying] summary judgment after . . . a full trial on the merits." *Id.* at 187–88. The denial "retains its interlocutory character as simply a step along the route to final judgment." *Id.* at 184; *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). That means that litigants must seek an interlocutory appeal before trial to limit an appellate court's review because "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Ortiz*, 562 U.S. at 184. So, in federal courts, appellants may petition for an interlocutory review of denied summary judgment motions. But, if it is denied and the parties proceed through trial, the reviewing court considers the record as a whole, including the trial record. Wisconsin's rule differs. In Wisconsin, appellate courts review nonfinal judgments—like denied motions for summary judgment—to determine whether a genuine issue of material fact existed that precluded summary judgment for the movant. Only if summary judgment was properly denied does the appellate court consider the evidence produced at trial.

the record at summary judgment and instead resting alone on the propriety of the jury verdict, the majority has essentially supplanted de novo review of a denied summary judgment on appeal with something more akin to a sufficiency-of-a-jury-verdict standard. This allows plaintiffs to turn workplace injuries into safe-place violations without proving a level of control or that the hazard preexisted the contractor's arrival. I dissent because the majority has now effectuated a sea change in summary judgment review and at the same time has imparted a strict liability standard for building owners.

¶50    Instead of the majority's new standard of review, our court is to first conduct a de novo review of the record at summary judgment concerning Lorbiecki's theory of Pabst's liability. Through that lens, the legal conclusion is inescapable: summary judgment should have been granted for Pabst. Lorbiecki never presented a genuine issue of material fact, on the sole exception he pursued, to support the conclusion that Pabst turned over unsafe premises to Lorbiecki's employer. And, the circuit court's determination that an unsafe condition existed before Lorbiecki arrived onsite is unsupported by this record. The circuit court erred when it concluded that there was an unsafe condition because Lorbiecki would disturb the asbestos. The circuit court's legal conclusions made the building owner liable for hazards created by the independent contractor, regardless of whether the building owner retained control or handed off a safe premise. Lorbiecki did not allege that Pabst turned over premises to the independent contractor that had existing airborne asbestos or that anyone other than one of Lorbiecki's employer's employees disturbed the asbestos. While an independent contractor owes a duty to create "safe" employment for its own employees, Pabst's duty to those employees is different. Its responsibility is to provide a safe *place.* It is not a guarantor to the independent contractor's employee that the kind of work he was hired to do will be safe. Mitigating the hazards associated with working with and disturbing asbestos was a duty that the independent contractor, not Pabst, owed to Lorbiecki. At summary judgment, and now before our court, the majority blurs the distinction between the duty an independent contractor owes to its employee and the duty a building owner owes to that employee. It is not that a building owner can never be liable to that employee, but more must be demonstrated.

¶51    The circuit court gave virtually no weight to the fact that Lorbiecki worked for an independent contractor at Pabst's facility. Instead, the majority, like the circuit court, engages in no such analysis of the law on this point. Because this case was treated as if it was an ordinary safe-place

case, a building owner is now liable if its building contains asbestos, even if the asbestos was undisturbed when an independent contractor arrives to work with the asbestos and even if it handed off control to the independent contractor. Regardless of whether the owner controlled the details of the work or provided safe premises before the work was conducted, the building owner is nonetheless liable to the employees of an independent contractor who was hired to safely work with and replace the asbestos.

¶52   Wisconsin law had long recognized that in order to proceed under the safe-place statute against a building owner, a plaintiff must demonstrate some facts which support either that: (1) the owner controlled the premises to the point where it could stand in the shoes of the independent contractor's employer to direct how the contractor accomplished the work the owner hired it to do; or (2) the premises were in an "unsafe condition" before the contractor began its work. *Potter v. City of Kenosha*, 268 Wis. 361, 372, 376–77, 68 N.W.2d 4 (1955); *Hortman v. Becker Const. Co., Inc.,* 92 Wis. 2d 210, 227–30, 284 N.W.2d 621 (1979); *and see Barth*, 71 Wis. 2d at 781 ("The test [for control] our court has stated is whether the owner . . . 'stood in the shoes of the (immediate) employer by reason of his retention of control of the premises.'"). Lorbiecki never asserted that Pabst exercised "control." In fact, at summary judgment Lorbiecki said that he was "not required to prove that Pabst maintained supervision or control" because his claim was premised upon an "unsafe condition" created by the mere presence of "asbestos-containing insulation" at Pabst's brewery. Despite no evidence that the asbestos at Pabst was unsafe at the relevant time, the circuit court nonetheless agreed with Lorbiecki and denied summary judgment for Pabst on Lorbiecki's safe-place claim.[4] The circuit

---

[4] The circuit court's order issued on March 2, 2020, stated:

> While the record appears to be devoid of evidence of active negligence or extrahazardous activity, fatal to a common law negligence claim under [*Tatera*], this does not immunize Pabst from the safe place statute claim. [*Anderson*]. Material issues of fact exist as to that claim and the motion is therefore denied.

The circuit court clarified its ruling on May 1, 2020:

> In this context, a common law negligence claim cannot be maintained in the absence of active negligence or extrahazardous

court did not identify any facts to support its legal conclusion that the premises were in an "unsafe condition" before the independent contractor began its work. The closest thing in the record are other remarks the circuit court made reaching its conclusion that the building owner could be liable because asbestos later became dangerous.[5] Although the parties agreed that asbestos existed at Pabst's brewery, nothing in the summary judgment record supports the conclusion that the asbestos at Pabst's brewery constituted an unsafe condition before Lorbiecki's employer, the independent contractor, disturbed it as a part of its work. The circuit court's conclusion, and now the majority's, holds a building owner strictly liable to an independent contractor's employee when a building contains asbestos, even if the contractor was hired to work with pipes that are marked "asbestos." A property owner who hires an independent contractor to

---

> activity. [*Tatera*] There is an absence of any such activity on the part of Pabst in this summary judgment record and the claim therefore does not survive the summary judgment motion. My letter of March 2, 2020, apparently should have been more explicit in that regard and any indication in the order signed in February to the contrary did not accurately reflect my ultimate ruling.
>
> However, while the safe place statute necessarily entails a failure to exercise ordinary care, it is only the statutory claim which is supported in the record and can survive. [*Anderson*]. I will therefore be signing the proposed order submitted by [Pabst's counsel].

[5] During the summary judgment hearing, the circuit court found:

> Mr. Schroeder does say that Mr. Lorbiecki did extensive work with or near pumps at locations where it's undisputed that [suppliers] supplied asbestos-containing pumps. Broadly read, the [case law] seems to suggest that if you've got the product there, they do the type of work that is likely to expose them to asbestos, it gets released into the air, that that's enough to warrant a jury finding that there's exposure and cause.

Later during the hearing, the court explained, "I would say that my understanding of [*Viola*] is that it stands for the proposition that a place of employment -- a place subject to the Safe Place Statute where their air is contaminated by airborne asbestos fibers is an unsafe condition under the statute."

5

remove pipes that have existing, undisturbed asbestos and replace them with asbestos-free pipes, is not liable to the employees of that independent contractor when the premises were safe until the independent contractor performed the work for which it was hired. In this case, Lorbiecki failed to show that either exception could apply, the court made no findings that either exception could apply, and summary judgment should have been granted in Pabst's favor.

¶53     These legal errors at summary judgment have been repeated throughout this case: "control" and "unsafe condition" have not been analyzed in accordance with safe-place law or our precedent. At summary judgment, trial and post-verdict, the same errors were repeated as the building owner's liability to the employee of an independent contractor was seemingly assumed regardless of the required legal analysis and proof. And the same errors recur again given the majority's assumptions that the jury verdict alone dispenses with the need for legal analysis of the building owner's liability to an employee of an independent contractor.

## II.  SUMMARY JUDGMENT

¶54     The majority agrees that summary judgments are appealable. However, the majority does not consider that failing to review summary judgments using the record at summary judgment effectively denies review. The majority, while claiming that summary judgments are reviewable, holds that denials of summary judgments are de facto unreviewable. In Wisconsin, summary judgment is to be granted "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Racine Cnty. v. Oracular Milwaukee, Inc.*, 2010 WI 25, ¶25, 323 Wis. 2d 682, 781 N.W.2d 88 (quoting WIS. STAT. § 802.08(2) (2007–08)). The party opposing summary judgment "'may not rest upon the mere allegations or denials of the pleadings'" but instead, through affidavits or otherwise, "'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.*, ¶26 (quoting § 802.08(3)). On a motion for summary judgment, the court decides whether there is a genuine issue of material fact; the court does not decide the fact. § 802.08(2); *Oracular Milwaukee*, 323 Wis. 2d 682, ¶25.

¶55     Summary judgment prevents unnecessary trials. *Caulfield v. Caulfield*, 183 Wis. 2d 83, 91, 515 N.W.2d 278 (Ct. App. 1994). It saves judicial resources, preserves witnesses' time and expenses associated with trial,

prevents delaying just resolutions, incentivizes circuit court judges to resolve legal issues that are unfit for a jury to decide, and saves litigants money helping to keep the courthouse doors open to all those who need the justice system.

¶56     In Wisconsin, denied motions for summary judgment are nonfinal judgments. *See* WIS. STAT. § 808.03(1). As a nonfinal judgment, litigants cannot appeal their denied motion for summary judgment as of right. *See id.* (stating that a "final judgment or a final order of a circuit court may be appealed as a matter of right to the court of appeals unless otherwise expressly provided by law"). That leaves litigants with an ultimatum: seek an interlocutory appeal or proceed to trial.

¶57     Historically, parties that proceeded to trial waived their right to appeal an order denying their earlier motion for summary judgment. *See e.g.*, *Wittke v. State ex rel. Smith*, 80 Wis. 2d 332, 259 N.W.2d 515 (1977); *Richie v. Badger State Mut. Cas. Co.*, 22 Wis. 2d 133, 125 N.W.2d 381 (1963). But when those cases were decided, Wisconsin allowed parties to appeal a denied summary judgment motion as of right. *See* WIS. STAT. § 274.33 (1963–64); WIS. STAT. § 817.33 (1975–76).

¶58     Since then, the rule has changed. Now, litigants no longer have the right to appeal denied motions for summary judgment. In fact, one month after *Wittke* was decided, the legislature rewrote the laws governing Wisconsin's appellate system to create Wisconsin's court of appeals. Ch. 187, Laws of 1977 (Dec. 1, 1977). By doing so, the legislature affirmatively revoked a litigant's right to appeal denied motions for summary judgment and created the intermediary appellate court system that did not exist when *Wittke* and *Richie* were decided. With the creation of an intermediate appellate court, litigants may only request permission to appeal the nonfinal order resulting from their denied motion for summary judgment from the appellate court, i.e., an interlocutory appeal. *See Corning v. Carriers Ins. Co.*, 88 Wis. 2d 17, 20, 276 N.W.2d 310 (Ct. App. 1979) ("An order denying a motion for summary judgment is not appealable as a matter of right, but may be appealed with permission.").

¶59     As practitioners know, interlocutory petitions are almost always denied. Faced with an almost-certain denial, litigants must decide: exhaust time and money filing for leave to file an interlocutory appeal with the circuit court—which will likely not be granted—while simultaneously petitioning an appellate court's review—also unlikely to be granted—and

frustrate civil court proceedings, or proceed to trial just to get a final judgment which then can be appealed as of right.

¶60 Recognizing this conundrum, Wisconsin's rule preserves a litigant's right to have their denied motion for summary judgment reviewed on appeal. The Wisconsin rule states that "[a]n appeal from a final judgment or final order brings before the court *all prior nonfinal judgments, orders and rulings* adverse to the appellant and favorable to the respondent made in the action or proceeding *not previously appealed and ruled upon*." WIS. STAT. § (Rule) 809.10(4) (emphases added). Thus, under § 809.10(4), parties need not seek interlocutory review of nonfinal judgments or orders—including those on dispositive motions, like motions for summary judgment—to preserve their right to appeal from those nonfinal judgments or orders after a subsequent final judgment or order is entered. *Mani v. Selective Ins. Co. of Am.*, 2026 WI App 6, ¶18 n.9, ___ Wis. 2d ___, ___ N.W.3d ___. But now, it is unclear whether the court's decision today is an implicit instruction to attempt to get that review because none will be afforded after trial.

¶61 When, post-trial, a denied motion for summary judgment is appealed, this court should begin by reviewing de novo the record as it existed at summary judgment, ignoring the jury's verdict. Here, there is no question that Pabst's partially-denied motion for summary judgment is before the court for review. It is now entitled to review of that denial. Accordingly, I would analyze the record at summary judgment and conclude that summary judgment should have been granted to Pabst.

WISCONSIN'S SAFE-PLACE STATUTE

¶62 Wisconsin's safe-place statute, WIS. STAT. § 101.11(1), is a negligence statute that imposes a heightened, non-delegable duty on employers or property owners to (1) construct, (2) repair and (3) maintain public buildings and workplaces in as safe a condition as the nature of the premises reasonably permits. *McGuire v. Stein's Gift & Garden Ctr., Inc.*, 178 Wis. 2d 379, 398, 504 N.W.2d 385 (Ct. App. 1993); *Dykstra v. Arthur G. McKee & Co.*, 100 Wis. 2d 120, 130–31, 301 N.W.2d 201 (1981). The safe-place statute deals with unsafe conditions of the workplace premises—not with the employee's activities conducted on the premises. *Barth*, 71 Wis. 2d at 779–80; *and see Viola v. Wis. Elec. Power Co.*, 2014 WI App 5, ¶18, 352 Wis. 2d 541, 842 N.W.2d 515 (differentiating between "hazardous condition[s]

result[ing] from an unsafe condition associated with the structure" and "reckless or negligent acts of persons on the premises").

¶63　　These safe-place duties are ongoing and extend to employees and "frequenters." *Barth*, 71 Wis. 2d at 778. An independent contractor's employee working on the premises is considered a frequenter. *Hortman*, 92 Wis. 2d at 226. The statute also requires employers to furnish and use safety devices and safeguards, and to adopt and use methods and processes reasonably adequate to render the place of employment safe. WIS. STAT. § 101.11(2)(a). Yet, these duties are not without exception.

¶64　　The safe-place statute differentiates between an employer's duty to its employees and a building owner's duty to those same employees, imposing different, fewer requirements upon owners. *Gennrich v. Zurich Am. Ins. Co.*, 2010 WI App 117, ¶7, 329 Wis. 2d 91, 789 N.W.2d 106. Under the statute, "employers" must furnish a safe "place of employment" for its "employees therein and for frequenters thereof" *and* "furnish employment which shall be safe for the employees therein." WIS. STAT. § 101.11(1). Employers "shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters." *Id.* The statute requires less from an "owner." An owner of a place of employment or a public building must "construct, repair or maintain such a place of employment or public building as to render the same safe." *Id.* Thus, an employer's duties to its employees are broader in scope than an owner's duty to someone else's employees as those employers must provide safe employment. *Id.*; *Miller v. Paine Lumber Co.*, 202 Wis. 77, 90, 227 N.W. 933, 229 N.W. 35, 230 N.W. 702 (1930). These distinctions become acutely relevant when a building owner hires an independent contractor to use its expertise to perform a dangerous task, and even more germane to the question of the owner's liability when the building is safe when the independent contractor begins its work.

¶65　　Under the safe-place statute and our precedent, owners are absolved of their statutory duties when they have (1) relinquished complete control and custody of the premises to the contractor, and the (2) premises are in a safe condition at that time. *See Potter*, 268 Wis. at 372 (absolving an owner of its safe-place duty when it relinquished complete control of the premises to the contractor in a safe condition); *Kaltenbrun v. City of Port Washington*, 156 Wis. 2d 634, 646, 457 N.W.2d 527 (Ct. App. 1990) ("A safe-

place duty is imposed upon an owner only when there is retention of a right of control beyond mere legal ownership or right of inspection.").

¶66    Thus, to be liable under the safe-place statute, Pabst must have either (1) retained control over the premises,[6] or (2) turned the premises over to Lorbiecki in an unsafe condition. At summary judgment, Lorbiecki argued only the latter and nothing in the record supports that contention. The circuit court made no findings that the premises were in an "unsafe condition" before the contractor began its work, nor could it have based on the evidence at the time of summary judgment. This case never should have proceeded further.

*1.  At Summary Judgment, Lorbiecki Did Not Contend
That Pabst Retained Control.*

¶67    At summary judgment, Lorbiecki did not assert that Pabst controlled the premises where he was working. In his own words, the control exception did not apply:

> The "supervision and control" element, however, is not a requirement in 'unsafe conditions' cases like [Lorbiecki's] case against Pabst. Accordingly, [Lorbiecki] is not required to prove that Pabst maintained supervision or control before this Court can find that Pabst retained a heightened, nondelegable duty to provide [] Gerald Lorbiecki a safe environment free from danger to his life, health, safety, or welfare.

Instead, Lorbiecki relied solely on the "unsafe condition" exception to Pabst's presumption of non-liability.

¶68    Without attempting to make an argument, the only conclusion that could be made is that Pabst relinquished control over its bottle house to the independent contractor. *See Indus. Risk Insurers v. Am. Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("[W]e will not abandon our neutrality to develop arguments."). Perhaps

---

[6] While "control" refers to the control of the premises, it really centers around who controls the details of the work. *See Barth*, 71 Wis. 2d at 781 ("The test [for control] our court has stated is whether the owner . . . 'stood in the shoes of the (immediate) employer by reason of his retention of control of the premises.'").

because Lorbiecki did not argue control, the circuit court did not identify any dispute or facts at summary judgment that the control exception applied.

### 2. *At Summary Judgment, Lorbiecki Did Not Introduce Any Evidence That Pabst's Brewery Contained An Unsafe Condition.*

¶69     Under the safe-place statute, "safe" is relative. *Megal v. Green Bay Area Visitor & Convention Bureau, Inc.*, 2004 WI 98, ¶10, 274 Wis. 2d 162, 682 N.W.2d 857. It does not mean "completely free of any hazards." *Id*. It means "such freedom from danger to the life, health, safety or welfare of employees or frequenters" and "such reasonable means of notification, egress and escape in case of fire . . . as the nature of the employment, place of employment, or public building, *will reasonably permit*." WIS. STAT. § 101.01(13) (emphasis added). "Just because a place could be made more safe, it does not necessarily follow that an employer or owner" violated the safe-place statute. *Megal*, 274 Wis. 2d 162, ¶10.

¶70     As the brewery's owner, Pabst's duty was to furnish a safe place. *Gennrich*, 329 Wis. 2d 91, ¶7. It was Lorbiecki's employer's duty to "do every other thing reasonably necessary to protect the life, health, safety or welfare of [its] employees." WIS. STAT. § 101.11(1), (2); *see also Deaton v. Unit Crane & Shovel Corp.*, 265 Wis. 349, 352–53, 61 N.W.2d 552 (1953) (announcing the safe-place statute does not make the employer or owner an insurer of the safety of a frequenter on the premises); *Tatera v. FMC Corp.*, 2010 WI 90, ¶17, 328 Wis. 2d 320, 786 N.W.2d 810 ("[I]mposing liability on [an owner] for injuries sustained by an independent contractor's employee runs counter to the notion that [the owner] has relinquished control to the independent contractor.").

¶71     Wisconsin Supreme Court precedent absolves a building owner, like Pabst, of liability if it turns over safe premises to contractors. The timing of when the asbestos became airborne, thus unsafe, is critical to the analysis of a building owner's liability. In *Barth*, 71 Wis. 2d 775, we affirmed the circuit court's order "setting aside the jury verdict" against the "owner" because of the limitations of owner liability under safe-place law. 71 Wis. 2d at 785. There, a general contractor hired a subcontractor to dismantle and remove ventilation ducts as part of remodeling an arena. *Id.* at 775–76. Barth, an employee of the subcontractor, was injured when a ventilation duct bottomed out, causing Barth to fall and land on the floor. *Id*. at 777. We held that "[o]rdinarily . . . an owner hiring an independent contractor to do work on his building . . . reserves no right or control of the

work excepting that of inspection or of changing the plan with reference to the construction to be furnished." *Id*. at 780. "The element of duty imposed by the safe place statute [was] completely absent under the circumstances" because when the contractor began work there was "no unsafe condition," and the general contractor did not control the subcontractor's employee's work. *Id*. at 782. The independent contractor's own actions in dismantling ventilation ducts created the danger. *Id.* at 776–77. *Barth* answers the question presented to the court today.

¶72    Our court in *Potter*, 268 Wis. 361, similarly rejected the argument that a building owner is liable under the safe-place statute if once-safe premises become dangerous because of the independent contractor's work. After the owner hired an independent contractor to install a sewer, one of the contractor's employees died during its excavation. 268 Wis. at 363. The "north bank of the trench" he was excavating to furnish the sewer "fell down" and "trapped" him. *Id.* "Since the premises were initially safe when turned over to the contractor by the [owner], and since the change of the premises which produced the damage resulted entirely from the action of the contractor, the [premises' owner] having retained no control over the same," was not liable on summary judgment. *Id.* at 376–77. *Potter* is directly on point.

¶73    No doubt, airborne asbestos exposure resulting from the repair or maintenance of asbestos-containing insulation surrounding pipes can create an "unsafe condition" within the meaning of the safe-place statute. *See e.g., Viola*, 352 Wis. 2d 541, ¶25; *Anderson v. Proctor & Gamble Paper Prods. Co.*, 924 F. Supp. 2d 996, 1003 (E.D. Wis. 2013), and *Calewarts v. CR Meyer and Sons Co.*, No. 2011AP1414, unpublished slip op., ¶24 (Wis. Ct. App. July 3, 2012). But even these cases that the majority relies upon demonstrate that a building owner's liability is not automatic. *See infra*, ¶¶90–92. As the brewery owner, Pabst's duty was to furnish a safe place at the time that it turned the premises over to Lorbiecki's employer, the independent contractor. *Gennrich*, 329 Wis. 2d 91, ¶7. It did. The plaintiff must carry the burden at summary judgment to demonstrate that an already existing, unsafe condition existed on the premises when the owner turned it over to the independent contractor. The record is completely absent of any such evidence or findings.

¶74    Importantly, the record reflects that Lorbiecki did not allege or provide evidence at summary judgment that Pabst brought Lorbiecki onto unsafe premises. Pabst's brewery indeed contained asbestos-filled insulation which, as a steamfitter, Lorbiecki worked with and near, but that

fact does not support the building owner's liability unless the asbestos was airborne before he began his work for his employer. At summary judgment, Lorbiecki's argument was that the presence of asbestos in the bottle house's insulation rendered the premises unsafe because his work for his employer caused the asbestos to become airborne. He argued that he "gathered evidence *to support [his] position that asbestos-containing products were being used on Pabst's premises*" (emphasis added). Lorbiecki claimed that "[h]is job duties required that he work with and in close proximity to asbestos-containing insulation, gaskets, and packing," that "the word 'asbestos' would be marked on insulation," "all of the high-pressure piping, specifically the piping in the bottling house, used asbestos-containing insulation," and that more "likely than not [] Mr. Lorbiecki was exposed to asbestos during his work at the Pabst Brewery," all because "asbestos-containing insulation was used on Pabst's premises." But, Lorbiecki never contended that he initially came into a facility that had existing airborne asbestos. Although all agreed that the asbestos had been on site for quite some time, Lorbiecki's argument was that the existence of asbestos, regardless of its form, constituted an "unsafe condition."[7] His argument was that the asbestos was an unsafe condition because he would have to disturb it as a part of his job. In other words, Lorbiecki's argument was that because asbestos existed at the premises, even if undisturbed until his employer began its work, Pabst is liable. The circuit court concluded that safe-place law "seems to suggest that if you've got the product there, they [steamfitters] do the type of work that is likely to expose them to asbestos, it gets released into the air, [and] that's enough to warrant a jury finding that there's exposure and cause." But this conclusion is incorrect as a matter of law. No evidence was ever produced, nor did the parties dispute, that

---

[7] Sales records and invoices from Pabst's suppliers showed that asbestos-containing pumps were supplied in 1967, 1969, and 1973 to the work sites where Lorbecki worked. Lorbiecki knew "that . . . these pumps left the [supplier's facility] with what we claim were defective component parts or asbestos-containing component parts. And that is why [Lorbiecki] believes that [he is] entitled to a denial of the Summary Judgment as to both the product liability claims and the negligence claims." Lorbiecki claimed he met his burden

> by showing the proof positive that the asbestos-containing
> products . . . were supplied to the sites; that co-workers supplied
> general testimony of the work that Mr. Lorbiecki performed on the
> pumps at those facilities; and . . . that [Lorbiecki's] experts opine
> that it was exposure to this asbestos that was a substantially
> contributing factor in causing Mr. Lorbiecki's disease.

the asbestos was not airborne, hence "unsafe," before the independent contractor's work began.

¶75 The mere existence of undisturbed asbestos-containing insulation does not alone constitute an unsafe condition, and there was no evidence at summary judgment that might support that contention. The dearth of evidence to find an existing "unsafe condition," is also reflected by the fact that the parties did not dispute that an unsafe condition existed before the independent contractor's work began. The law does not hold the building owner liable unless it turned over premises that were unsafe. In other words, the building owner is not liable for airborne asbestos that first became airborne by the contractor's work. *Potter*, 268 Wis. at 376–77. The record, the arguments, and the circuit court findings all demonstrate that there is no support in the record for a conclusion that airborne asbestos was on the premises before the contractor's work began. This temporal determination is missing and without it, the building owner cannot be liable as a matter of law. In the absence of affidavits, pleadings, discovery responses, admissions, or even averments, the record does not and could not support an inference that any of the asbestos was airborne, in an unsafe condition, before Lorbiecki arrived at Pabst.

¶76 Lorbiecki's sole argument was that because the building contained asbestos insulation it was unsafe. He never contended that Pabst's building was unsafe before his employer began its work. His own argument was that his asbestos exposure was caused by his steamfitting duties.[8] He argued, "[t]he removal of insulation, whether by Mr. Lorbiecki or another individual working in close proximity to Mr. Lorbiecki, created dust which Mr. Lorbiecki breathed." Even Lorbiecki's fellow steamfitter's deposition testimony made that very point. Lorbiecki's colleague, Mr. Schroeder, never saw him working at Pabst; Schroeder worked in a different building than Lorbiecki and could not recall who was Lorbiecki's employer. But Schroeder testified during his deposition that Lorbiecki's work would have involved removing old pipe and asbestos-filled insulation before replacing the pipe. That work, according to Schroeder, created the dust that steamfitters inhaled. The fact that Lorbiecki does not contend that any asbestos was airborne before he and his coworkers arrived

---

[8] Whether Lorbiecki even worked at Pabst during the relevant time is questionable given the state of the record and the inconsistencies in the deposition testimony.

at Pabst places Pabst's liability to Lorbiecki outside the scope of the safe-place statute. *See Stefanovich*, 86 Wis. 2d at 167 (holding that the safe-place statute applies to unsafe conditions at workplaces—not "an act in the process of taking place"); *Deaton*, 265 Wis. at 352–53 (deciding that WIS. STAT. § 101.11 deals with unsafe conditions of the employer's premises and not with an employee's activities conducted on the premises).

¶77 Given Lorbiecki's own arguments and evidence, the work he performed for his employer was what created the unsafe condition at Pabst's brewery. At summary judgment, Lorbiecki did not argue that Pabst retained control of the brewery. Instead, Lorbiecki argued that the existence of asbestos on the premises itself constituted an unsafe condition. His argument and the circuit court's legal conclusions misunderstand the temporal part of the liability analysis: the premises being safe or unsafe when they were turned over to the independent contractor. The circuit court never identified anything that would support the conclusion that asbestos at Pabst was disturbed prior to Lorbiecki's arrival; thus, it could not conclude that the building was in an "unsafe condition." Nonetheless, the circuit court did decide that Pabst could be found liable even though the asbestos became disturbed because of Lorbiecki's work for his employer. Because safe-place law does not support the circuit court's legal conclusions regarding Pabst's liability to Lorbiecki and no evidence at summary judgment supports the contention that Pabst turned over an unsafe building to the independent contractor, Pabst should have been granted summary judgment.

### III.  TRIAL AND POST-TRIAL

¶78 The legal errors committed at summary judgment permeate throughout this case and continue because the majority relies on the jury verdict without any consideration of the general rule that a building owner is not liable to the employee of an independent contractor unless an exception is demonstrated. This case was treated as if it was an ordinary safe place case, as is demonstrated by the standard jury instruction on control. There is no discussion of absolving Pabst of liability because it handed off control to Lorbiecki's employer. The circuit court and now the majority, err by giving no weight to the fact that Lorbiecki worked for an independent contractor and that work disturbed the asbestos. The majority blurs the distinction between the duty an independent contractor owes to its employees and the duty the building owner owes to that same employee. This case proceeded to trial against the building owner without the foundational legal conclusions of "control," or "unsafe condition." And to

the extent that the majority may be relying on the circuit court referencing airborne asbestos as an unsafe condition, the majority errs by not analyzing that legal conclusion further. The law requires much more than this record demonstrates. It was error for this case to proceed to trial and denial of the post-verdict motions exacerbated the same errors that existed at summary judgment. To be clear, Pabst's summary judgment motion should have been granted, but because the majority rests its conclusions on the jury verdict, I will further address the law and the additional evidence adduced at trial. This exercise also demands reversal.

### A. PABST RELINQUISHED CONTROL OF ITS BREWERY.

¶79     Although Lorbiecki did not argue that Pabst exhibited control at summary judgment, the arguments have shifted and the jury was given the standard instruction on control as if Pabst's liability to an independent contractor's employee is of no legal consequence. Lorbiecki now argues control on appeal, and the majority seizes on what it concludes is Pabst's control. But the law on control requires more than what the majority concludes.[9] And, the proper control analysis is absent.

¶80     To avoid liability, Pabst had to relinquish complete control of the property. *Kaltenbrun*, 156 Wis. 2d at 646. But, as our cases make clear, "complete" control does not really mean complete. If it did, an owner would always be liable. Instead "control" centers around who controls the details of the work. *See Barth*, 71 Wis. 2d at 781 ("The test [for control] our court has stated is whether the owner . . . 'stood in the shoes of the (immediate) employer by reason of his retention of control of the premises.'"). And safe-place liability is not a strict liability standard for all building owners.

¶81     Owners do not need to completely abandon control of the entire premises. In fact, the owner must retain some control over the premises to carry out its ongoing duty to furnish a safe place of employment to its own employees. *Schwenn v. Loraine Hotel Co.*, 14 Wis. 2d 601, 607, 111

---

[9] Despite Lorbiecki not arguing for the control exception at summary judgment, the jury was given standard safe-place instructions, including instructions concerning Pabst's control. Then, on appeal, Lorbiecki argued that Pabst controlled the premises. Since the arguments have shifted, and the jury was given instructions on "control," it is necessary for us to address the issue and what the evidence showed at trial.

N.W.2d 495 (1961). Instead, the owner must relinquish control only of the part of the premises that the contractor is working in. *Anderson*, 924 F. Supp. 2d at 1003–04. And, owners need not surrender every aspect of "control."

¶82 Undoubtably, owners can relinquish "control" while retaining their right to suspend work to inspect its progress. *Potter*, 268 Wis. at 376. Owners may also change the work's plan without having control of the premises. *Barth*, 71 Wis. 2d at 780. Even retaining the right to stop construction progress does not establish control under the law. *Berger v. Metro. Sewerage Comm'n of Milwaukee Cnty.*, 56 Wis. 2d 741, 750, 203 N.W.2d 87 (1973); *Luterbach v. Mochon, Schutte, Hackworthy, Juerisson, Inc.*, 84 Wis. 2d 1, 10, 267 N.W.2d 13 (1978).

¶83 Instead, the law requires that a building owner "control" the details of an independent contractor's work. *See Barth*, 71 Wis. 2d at 781 (concluding that a subcontractor failed to establish the retention or exercise of control over the details of the work sufficient to find "control" under the safe-place statute); *and see Weber v. Hurley*, 13 Wis. 2d 560, 569, 109 N.W.2d 65 (1961) (distinguishing—for determining who controlled construction—between restrictions or specifications relating to the end result and the actual manner in which the work was accomplished).

¶84 Owners may periodically inspect the work, change plans, halt activities, and ensure contractual compliance without retaining "control" as that term is used for safe-place purposes. *Barth*, 71 Wis. 2d at 780–81. The legal analysis must be on who exhibits "control over the details of the work." *Id*. at 781. When an independent contractor is hired, the contractor creates a place of employment when they begin working on the premises. Because that contractor dominates its own workplace, it owes a safe-place duty to its employees. Yet, the jury never was instructed on these legal principles.

¶85 Despite this applicable law, the majority nonetheless concludes that "a reasonable jury could find that Pabst retained control over the place where [Lorbiecki] worked" because "Pabst owned the brewery," conducted daily inspections where Lorbiecki worked, "imposed safety and sanitation requirements on contractors and mandated notification to Pabst 'whenever the contractors' employees [were] going to weld or cut, so that all necessary precautions are taken to prevent a fire or explosion in and around [Pabst's] plant.'" Majority op., ¶23. But none of these factors satisfy the "control" element of safe-place parlance. If they did, every building

owner would be liable to a contractor's employees for the independent contractor's work and practices.

¶86     Merely owning the brewery is insufficient to establish Pabst's control of the premises, but this case was tried as if it is. *Kaltenbrun*, 156 Wis. 2d at 646. Inspecting the work, sending a memorandum imposing OSHA's safety requirements, and knowing when certain procedures would occur does not amount to control over the details of the work. *Id*. At first blush, Pabst's notification and safety precautions might seem to be a closer call. But enforcing OSHA-required regulations to ensure employee safety in other parts of the brewery falls short of establishing that Pabst exercised any dominion "over the details of the work." *Barth*, 71 Wis. 2d at 781; *see also Luterbach*, 84 Wis. 2d at 9–10; *Berger*, 56 Wis. 2d at 750. The record refutes the notion that Pabst exercised any control over its independent contractor's work. There is no circuit court finding in that regard. In fact, Schroeder testified that Pabst never told him—and presumably never told Lorbiecki—how to perform his duties. Specifically, at his deposition, Schroeder was asked, "And Pabst never told you how to perform your duties, correct?" He answered, "No. Pabst didn't have anything to do with it. . . . Pabst didn't tell us what to do, no."

¶87     Instead, the things the majority says constitute "control" actually demonstrate Pabst's compliance with its own ongoing safe-place duties to its employees and evolving OSHA regulations. Considering that the safe-place statute imparts an ongoing duty on Pabst to keep its premises safe for its employees and frequenters, these requirements serve those ends. Pabst had a duty to protect its employees and other frequenters from, for example, a potential fire, and being aware of the independent contractor's projects allowed Pabst to provide "reasonable means of notification, egress and escape in case of fire." *See* WIS. STAT. § 101.01(13). It was for such legitimate purposes that Pabst mandated Lorbiecki's employer to notify it before beginning its cuts and welds. *See* majority op., ¶24 ("The memo makes clear that Pabst needed to be notified of the welds or cuts in advance 'to prevent a fire or explosion in and around the plant.'"). Punishing owners for complying with their ongoing safe-place duties disincentivizes compliance with the portions of the safe-place statute concerning fire hazards when an owner hires an independent contractor. These practices are hardly sufficient to demonstrate Pabst maintained control over the details of Lorbiecki's work. It merely shows Pabst's compliance with its duties to its employees and other frequenters under safe-place law. Nothing in the record, and no circuit court finding, demonstrates that Pabst controlled the details of Lorbiecki's work, like which pipes he would work

on, where he worked, which welds and cuts he would make, when he would make them, how he would make them, what tools and safety measures he would employ, any other practices he may use or avoid, or any of the other methods Lorbiecki would employ concerning the actual manner in which his work was accomplished. *See Weber*, 13 Wis. 2d at 569 (distinguishing between restrictions and specifications and the actual manner in which the work was accomplished).

¶88 Simply put, Pabst never "stood in the shoes of the (immediate) employer by reason of [its] retention of control of the premises." *Barth*, 71 Wis. 2d at 781. The majority, like the circuit court, adopts a strict liability standard for building owners who hire independent contractors rather than analyzing the legal standard of control over the details of the manner in which the work is accomplished. The majority's definition of control, when it applies to a building owner's liability to an independent contractor's employee, is sweeping. *See id.* The majority should be applying the proper legal standard of "control," analyzing the lack of evidence of "control" at trial, reviewing what the jury was instructed on "control," and concluding that no reasonable jury could have found Pabst liable under the facts of this case. As a matter of law, no evidence supports Pabst's liability based upon its "control."

### B. PABST'S BREWERY DID NOT HAVE AN UNSAFE CONDITION ON THE PREMISES.

¶89 The facts also do not support a finding that an "unsafe condition" existed when Pabst relinquished control to Lorbiecki's employer. Safe-place law does not hold every building owner liable to an independent contractor's employee. Although a jury instruction was requested by Pabst,[10] the record is absent of any indication that the jury was

---

[10] The circuit denied Pabst's requested jury instructions. Pabst's proposed jury instruction stated:

> To the extent that an independent contractor is employed to redress or correct a problem for the principal, even if the contractor's activity may be viewed as either intrinsically dangerous or may require precautions, employees of the contractor have no claim against the principal based solely on either acts of the contractor or the condition to be remedied, or some combination of the both. The contractor is presumably best equipped to evaluate

instructed on the duty a building owner owes to the employee of an independent contractor who is injured as a result of the work done for his employer. Nonetheless, the majority relies on the jury's conclusions without any regard for the distinction between the duty an independent contractor owes to its own employees, with the building owner's duty to those same employees, to turn premises over to their employer in a safe condition. With lean analysis of our case law on point, *see supra*, ¶¶71–72, and without regard for the absence of evidence in the record, the majority nonetheless reconciles its support for the jury verdict with cases that are distinguishable from Lorbiecki's. *Viola*, 352 Wis. 2d 541, *Anderson*, 924 F. Supp. 2d 996, and *Calewarts*, No. 2011AP1414. In each of these cases, the frequenters arrived to workplaces where asbestos had already been disturbed. In other words, each of the workers in those cases arrived on premises where airborne asbestos already existed. Unlike those cases, Lorbiecki was not brought into an environment where preexisting, airborne asbestos was present. His employer, the independent contractor, was hired to do steamfitting, which by necessity meant working with and replacing the pipes that were insulated with asbestos-filled products. As a part of this project, the independent contractor's employees were the first to disrupt the asbestos and did so as a part of their work. Unlike the cases that the majority relies upon, it was the independent contractor's work, not preexisting airborne asbestos, that created the unsafe condition. As a matter of law, no "unsafe condition" existed at the relevant time.

¶90 More specifically, in *Viola*, an independent contractor routinely repaired asbestos-covered pipes alongside tradesmen who "toiled together in partially enclosed spaces where the release of asbestos dust would circulate for all the workers to breath[e]." 352 Wis. 2d 541, ¶5. Previous "installation, repair, and removal of asbestos-containing products" ensured that the contractor was "constant[ly in] contact with

---

the necessary precautions and determine the standard of ordinary care.

Employees of the contractor should have no claim against a principal for their own or the contractor's failure to use ordinary care in carrying out the contractor's assignment. Nor should a principal be liable to a contractor or its employees simply by reason of employing the contractor to engage in inherently dangerous activity. Nor can a principal/owner be held liable for negligent selection of the contractor as a principal/owner cannot be held liable for any passive negligence.

asbestos dust" such that his clothes looked like they were "dipped in flour" by the end of his shift. *Id*. The building owner knew about the dangers of airborne asbestos "years before" the contractor began maintaining the pipes, but "did nothing to alleviate the dangers of asbestos exposure" in the more than 25 years that the contractor worked at the facility. *Id.*, ¶¶7, 9. The court of appeals held that the independent contractor's employee sufficiently pled that there was an unsafe condition on the premises because "[t]he regular maintenance . . . of the premises required that the asbestos be disturbed" and the employer "knew about the asbestos and its health hazards, but failed to protect [the contractor] from these hazards." *Id.*, ¶25. The airborne asbestos dust predated the contractor's employment and rendered the premises unsafe. *Id*. In fact, *Viola* instructs that Lorbiecki's claim fails, as it was his work that first created the unsafe condition, and he did not come into an already existing unsafe premises because of airborne asbestos.

¶91    In *Anderson v. Proctor & Gamble Paper Products Co.*, asbestos dust was routinely released into the air during regularly-conducted repair work in a paper mill before the plaintiff began his employment. 924 F. Supp. 2d at 1003. In that case, an employee sued the building owner because he was subjected to an already existing unsafe condition that the building owner allowed: airborne asbestos. As an electrician the independent contractor spent over two decades "exposed to asbestos in a number of ways." *Anderson,* 924 F. Supp. 2d at 999. A "normal, everyday process" for the electrician required "removing or cutting [asbestos-filled] insulation" creating a "plume of cloud dust" for the contractor to work in. *Id*. at 1000. The paper mill's owner controlled the independent contractor's employee's work schedule and furnished him with the materials necessary to complete his work but never warned him "about the dangers of asbestos, or even that the pipe insulation contained asbestos at all." *Id*. The United States District Court for the Eastern District of Wisconsin held that the asbestos dust in the air exposed the electrician to an unsafe condition on the premises. *Id*. at 1003. Once again, the building's owner ignored its duty to maintain safe conditions on its premises and allowed unwitting contractors to work in airborne asbestos that predated the independent contractor's employment without mitigating the dangers.

¶92    And, in *Calewarts v. CR Meyer and Sons Co.*, factory employees were exposed to asbestos while operating various machines at the factory. *Calewarts*, No. 2011AP1414, at ¶¶6–8, 24, 45. There, a factory employee sued the building owner because he had been subjected to an already-existing unsafe condition that the building owner never remedied. The factory

worker worked with steam-powered printing presses for nearly 40 years. *Id.*, at ¶4. The pipes that supplied the steam to power the presses were "covered with asbestos insulation" and "'invariably' leak[ed]" requiring weekly repairs. *Id.*, at ¶¶6–7. During the repairs, the asbestos-filled insulation was constantly "torn off" or "knocked off" covering the presses and press ovens with asbestos dust, which was blown around the factory creating an environment where there was "always dust." *Id.* Though the frequency of the repairs made it "certain" that the employee was working "where piping was being repaired," the employer was the building owner and never gave the employee protective gear, safety warnings or instructions, nor abated the asbestos. *Id.*, at ¶¶6–8. The court of appeals concluded that the employer failed to maintain a safe premises in which the employees worked. *Id.*, at ¶32. The factory was an existing, unsafe place. *Id.*, at ¶¶6–8.

¶93    Unlike Lorbiecki's case, in each of the cases that the majority relies upon to uphold the jury verdict, the place of employment was unsafe before the plaintiff arrived. In each case, the premises either had existing airborne asbestos predating the contractor's employment on the premises that was created by the building owner's employees, or the asbestos was disturbed by someone other than the contractor, leaving the building owner responsible because of the existing "unsafe condition." Instead of relying upon *Viola*, *Anderson*, and *Calewarts*, the majority should instead look to our Wisconsin Supreme Court precedent (*Barth*, 71 Wis. 2d 775; *Potter*, 268 Wis. 361) which present facts and legal principles more akin to those of Lorbiecki's case. *See supra*, ¶¶71–72.

¶94    Even at trial, Lorbiecki's evidence did not demonstrate that Pabst provided Lorbiecki with an unsafe building with existing airborne asbestos. Asbestos first became airborne because of the kind of work that Lorbiecki did for the independent contractor. The independent contractor was hired to remove and replace the asbestos-covered pipes.

¶95    Before trial began, the parties agreed that "asbestos in place" "does not cause any harm" and "is not a hazard." Instead, "the asbestos really needs to be airborne for there to be a potential inhalation exposure." During trial, Schroeder testified that the kind of work Lorbiecki performed would require him to chisel and hammer away at asbestos-containing insulation that "sent insulation dust flying into the air." According to Schroeder—who could not verify Lorbiecki's work at Pabst during the relevant time nor for the relevant employer—the removal of insulation caused the visible, airborne dust that Lorbiecki would have inhaled. And,

an expert witness confirmed that "'extremely high' asbestos exposures occur from tearing out asbestos insulation and these are 'very, very heavy concentrated, dense exposures to asbestos.'" Lorbiecki's expert witness admitted that "there is no testimony and no evidence to prove that" anyone other than the independent contractor disturbed the asbestos which caused Lorbiecki's injuries, and it was Lorbiecki's asbestos exposure resulting from "working as a steamfitter at the Pabst plant [that] constituted a substantial factor in causing his mesothelioma and, therefore, in causing his death." Indisputably, asbestos existed at Pabst's brewery before Lorbiecki arrived, but it was not airborne. Lorbiecki's own argument and supporting evidence demonstrates that the steamfitters performed unsafe work for the independent contractor, their employer, which caused the undisturbed asbestos to become airborne. This, however, is not the legal standard to impart liability to Pabst. The majority indeed recognizes that undisturbed asbestos is not dangerous, and it must recognize that no evidence supports that airborne asbestos existed when Lorbiecki came to the premises. Curiously though, it relies on distinguishable cases wherein a plaintiff came into premises where there was airborne asbestos. *See* majority op., ¶¶4, 9, 27. Since the evidence demonstrated that the asbestos was undisturbed until the steamfitting work occurred and the parties stipulated that undisturbed asbestos is safe, as a matter of law, Pabst did not turn over unsafe premises to the independent contractor and cannot be held liable. Given the state of the record, even after trial, the judgment notwithstanding the verdict motion (which was essentially the summary judgment motion renewed) should have been granted as Lorbiecki did not demonstrate the preexisting "unsafe condition" exception applied.

¶96     As a matter of law, when an owner relinquishes control to an independent contractor of a safe place, and,

> if thereafter in the performance of the work under the contract the premises are changed by the contractor and as a result a hazardous condition is created, the owner does not become liable to the contractor's employee injured as a consequence of such hazardous condition while acting in the scope of his employment.

*Potter*, 268 Wis. at 372; *see also Stefanovich*, 86 Wis. 2d at 169 (describing accidents caused by negligent "acts of operation" or "activity conducted on the premises" rather than an unsafe condition of the premises fall outside of the scope of the safe-place statute). Like the plaintiffs in *Barth* and *Potter*, Lorbiecki's injuries result from the work of the independent contractor,

work he was hired to do for his employer. His injuries do not stem from existing "unsafe conditions," airborne asbestos, on an owner's premises. They result from his work for his employer, the independent contractor. *See also Deaton*, 265 Wis. at 352–53; *L. G. Arnold, Inc. v. Industrial Comm'n*, 267 Wis. 521, 525–26, 66 N.W.2d 176 (1954); *Gross v. Denow*, 61 Wis. 2d 40, 47, 212 N.W.2d 2 (1973); *Korenak v. Curative Workshop Adult Rehab. Ctr.*, 71 Wis. 2d 77, 84, 237 N.W.2d 43 (1976); *Barth*, 71 Wis. 2d at 779–80. To conclude otherwise requires building owners "to superintend the activities of the employee of a subcontractor" despite the fact that the safe-place statute imposes no such duty. *See Barth*, 71 Wis. 2d at 780. As a matter of law, no evidence, even after trial, supports "unsafe condition."

¶97     At a minimum, the motion for judgment notwithstanding the verdict, which essentially renewed the motion for summary judgment, should have been granted as the entire record also demonstrates that it was the independent contractor's work that caused the asbestos to become airborne. Nothing in the record and no findings by the circuit court support the conclusion that Pabst provided the independent contractor with a building that was in an "unsafe condition."

## IV.  CONCLUSION

¶98     The law is the law. The record at the time of summary judgment established that summary judgment should have been granted to Pabst. Delving into the record, this case never should have proceeded to trial. At trial, the same problem was perpetuated as neither exception was demonstrated by Lorbiecki to establish Pabst's liability. After trial, the legal errors continued as the motion for judgment notwithstanding the verdict, which was essentially the motion for summary judgment renewed, should have been granted. The parties' stipulations, the arguments made, and the facts adduced at trial do not support what is required by law to find Pabst liable. While summary judgment should have been granted, at a minimum the post-verdict motion should have been granted for Pabst, because Pabst neither (1) controlled the details of Lorbiecki's work nor (2) turned over a building that was in an unsafe condition.

¶99     Lorbiecki never alleged nor proved that Pabst controlled the work of the independent contractor. The circuit court never made any such findings. As a matter of law, the jury verdict is flawed; the jury was never even given an instruction on the proper legal standard concerning a building owner's duty to the employee of an independent contractor. Wisconsin Supreme Court case law establishes that more is required than

an owner's right to inspect an area where work is being done or receive notice that certain activities are ongoing to amount to "control" in safe-place parlance. *Potter*, 268 Wis. at 376. Even if the independent contractor had to notify Pabst about welds or cuts, it was nonetheless the independent contractor who chose where the welds and cuts would be and how to make the welds and cuts. And that does not amount to control. Nothing in the record establishes that Pabst controlled the details of Lorbiecki's work. As in *Barth*, Pabst enlisted the expertise of an independent contractor to complete work that Pabst itself did not have the expertise to do. As established in the record, Pabst in no way retained or exercised control over the details of the work. *Barth*, 71 Wis. 2d at 780–81.

¶100 At every stage in this case Lorbiecki failed to demonstrate that airborne asbestos existed on the brewery's premises before he arrived onsite. Lorbiecki never argued this was the case and the circuit court did not identify any facts that would support its legal conclusion. Unlike the employees in *Viola*, *Anderson*, and *Calewarts*, Lorbiecki did not unknowingly come to premises where dangerous airborne asbestos already existed. His employer was hired for its expertise. The asbestos was undisturbed until his employer began working. His presence at the brewery and exposure to the airborne asbestos occurred because of the work required by his employment. *See Anderson*, 924 F. Supp. 2d at 1001 (concluding that the activity of working with asbestos is "inherently dangerous" yet not "extrahazardous"). The summary judgment motion should have been granted, and its denial deserves a de novo review of the evidence at the time of summary judgment.

¶101 Today's majority overhauls appellate review of denials of summary judgment. The majority opinion creates strict liability for premises' owners who hire independent contractors to remove or safely work with asbestos, even if the asbestos is undisturbed prior to that work. Apparently, the majority accepts the circuit court's conclusion that, as a matter of law, if a building contains undisturbed asbestos, it is "unsafe" under the safe-place statute. But the circuit never identified any facts which might support this holding, nor could it. The record is absent of any such evidence, and the majority does nothing to rectify the circuit court's incorrect assumptions which formed the basis for the denial of summary judgment. Notably, at trial the parties stipulated that undisturbed asbestos is not unsafe. Testimony established that it was Lorbiecki's job that required him to first disturb the asbestos.

¶102   I indeed feel very sorry for Mr. Lorbiecki, his wife, and loved ones. No one should so suffer. But under the law, he was an employee of an independent contractor, was injured in the scope of his employment, which required him to "hammer and chisel away at asbestos-containing insulation." Prior to that work, nothing indicates that the building was in an unsafe condition. The mere presence of asbestos on the property, particularly in an undisturbed state, does not qualify as an "unsafe condition" on this record. Our precedent confirms as much.

¶103   The impact of today's opinion leaves civil practitioners wondering what, if anything, is left of appellate review of a denied summary judgment motion. It essentially leaves building owners strictly liable for the mere presence of asbestos on their property, even if undisturbed. Our court should be reviewing the denial of summary judgment based upon the record as it existed when the circuit court made its ruling under the correct legal standards. In doing so, Lorbiecki's own arguments demonstrate that he failed to establish "control" or an "unsafe condition." And, even after trial, nothing established the building owner's liability under either theory. At a minimum, Pabst's post-verdict motion should have been granted.

¶104   For all the foregoing reasons, I respectfully dissent.